PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

THOMAS VARGHESE, Dr.,
            *Plaintiff-Appellee,*

v.

HONEYWELL INTERNATIONAL,
INCORPORATED; HONEYWELL
TECHNOLOGY SOLUTIONS,
INCORPORATED,
            *Defendants-Appellants.*

No. 04-2271

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
William M. Nickerson, Senior District Judge;
Alexander Harvey, II, Senior District Judge.
(CA-01-3348-WMN)

Argued: May 25, 2005

Decided: September 14, 2005

Before MOTZ and GREGORY, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

Affirmed in part, reversed and vacated in part, and remanded in part by published opinion. Judge Gregory wrote the majority opinion, in which Judge Motz concurred in Parts I and II and Senior Judge Hamilton concurred in Part III. Judge Motz wrote a separate opinion dissenting from Part III. Senior Judge Hamilton wrote a separate opinion dissenting from Part II.B.

## COUNSEL

**ARGUED:** Michael L. Banks, MORGAN, LEWIS & BOCKIUS, L.L.P., Philadelphia, Pennsylvania, for Appellants. Eric Kenneth Bachman, WIGGINS, CHILDS, QUINN & PANTAZIS, P.C., Washington, D.C., for Appellee. **ON BRIEF:** Kathy B. Houlihan, Christine B. Cox, MORGAN, LEWIS & BOCKIUS, L.L.P., Washington, D.C., for Appellants. Timothy B. Fleming, WIGGINS, CHILDS, QUINN & PANTAZIS, P.C., Washington, D.C., for Appellee.

## OPINION

GREGORY, Circuit Judge:

Dr. Thomas Varghese brought suit against Honeywell International Inc., and Honeywell Technology Solutions, Inc.,[1] alleging, among other things, that Honeywell violated Maryland law when it failed to pay him separation benefits and terminated his right to exercise previously granted stock options. A jury returned a verdict for Dr. Varghese on both of these claims, granting Dr. Varghese $337,000 on his stock options claim and $25,571.73 on his separation pay claim. The damages granted to Dr. Varghese on his stock options and separation pay claims were enhanced under the Maryland Wage Payment and Collection Law ("MWP&CL"). Honeywell challenges this result on two grounds. First, Honeywell argues that the stock options were not wages, and therefore not covered by the MWP&CL and subject to an enhancement. Second, Honeywell argues that the separation pay claims are preempted by ERISA.

---

[1]Defendant Honeywell International, Inc. ("Honeywell"), is a Maryland corporation founded in 1985. It was re-formed in 1999 through its merger with AlliedSignal Inc. Defendant Honeywell Technology Solutions, Inc., formerly Allied Technical Services Corporation ("ATSC") is a wholly owned subsidiary of Honeywell. AlliedSignal purchased Bendix Field Engineering Corporation in 1993. Honeywell, Honeywell Technology Solutions, Inc., and all predecessor entities are hereinafter referred to as "Honeywell."

We find that Honeywell's ERISA preemption argument is not properly before us. However, because we find that the stock options are not in fact "wages" as that term is defined by the MWP&CL, we reverse in part the judgment of the district court, vacate in part the jury's award to Dr. Varghese, and remand to the district court for redetermination.

## I.

Dr. Varghese began his employment with Honeywell International Inc.'s predecessor, Bendix Field Engineering Corp., as a Field Engineer in 1983. The terms of Dr. Varghese's employment offer provided him with a monthly salary, a travel and relocation allowance, and various fringe benefits then available to other comparable employees. In early 1998 Dr. Varghese requested, and was granted, a one year unpaid leave of absence to pursue an advanced degree in the executive management program at the Massachusetts Institute of Technology Sloan School of Management. At the time of his leave of absence, Dr. Varghese was a Senior Principal Engineer, a salary band 4 level employee. Although Honeywell paid Dr. Varghese's tuition for the management program and agreed to make every effort to reinstate him to his position or to a comparable position at the end of his leave of absence, the company informed Dr. Varghese that it could not guarantee that he could return to active employment with Honeywell.

Upon the completion of the executive management program in May of 1999, Dr. Varghese requested reinstatement with Honeywell. However, due to substantially changed business conditions, Honeywell did not offer Dr. Varghese a position. On August 21, 1999, Dr. Varghese sent a letter to Honeywell stating: "If there are no opportunities within ATSC, despite waiting for more than 3 months now since the original communication, I am only left with the option of asking for termination of my employment and earned severance." J.A. 361. On October 7, 1999, Honeywell informed Dr. Varghese "that due to current business conditions we are unable to identify a suitable position to which you can be reinstated at this time and have taken action to terminate your employment with ATSC effective May 31, 1999." J.A. 205. On that same day, Honeywell's human resources department completed the necessary paperwork to terminate Dr. Var-

ghese's employment. Importantly, Honeywell classified Dr. Varghese's termination as "voluntary."

During his sixteen-year tenure at Honeywell, Dr. Varghese received 4800 stock options through four separate stock option grants.[2] Under the Honeywell compensation system, all executive-level employees (i.e., those classified by the corporation as salary band 5 or above) automatically received annual option grants. For non-executive employees (i.e., salary band 4 and below), of which Dr. Varghese was one, option grants were discretionary awards. In granting these awards, Honeywell considered "the duties of the employees and their present and potential contributions to the Company's success." J.A. 188. Importantly, on appeal, Dr. Varghese does not contend that he was ever promised the stock options in question.

After his termination, Dr. Varghese set out to obtain his earned severance benefits and to exercise his stock options. Dr. Varghese's options had fully vested at the time of his termination, entitling him to exercise any or all of them by purchasing the shares at the strike price.[3] Dr. Varghese attempted to exercise his options in October and November of 1999. However, because Dr. Varghese's termination was classified as "voluntary" rather than as a "reduction-in-force" he had only three months to exercise his options from his date of termination.[4] Because Honeywell backdated Dr. Varghese's termination to May 31, 1999, the options had already expired when Dr. Varghese attempted to exercise them.

---

[2]On July 31, 1992 and July 30, 1993, Honeywell granted Dr. Varghese 1600 options. On July 29, 1994, Honeywell granted Dr. Varghese 1000 options. Finally, on July 19, 1996, Honeywell granted Dr. Varghese 600 options.

[3]A "strike price" is the fixed price at which the owner of a stock option can purchase the underlying security. Where the market value of the underlying security is higher than the "strike price" at which an employee may purchase the security, the option holder may profit from the exercise of the options.

[4]Under the terms of the stock option plan, if Dr. Varghese's termination had been classified as a "reduction in force," he would have had three years from his date of termination to exercise his options.

Additionally, the classification of Dr. Varghese's termination as "voluntary" meant that he was not entitled to separation pay. Under Honeywell's separation plan, separation pay was an element of the Salaried Employees Benefit Plan, applicable to salaried employees otherwise eligible to receive such benefits. Critically, while employees whose separation from the company was due to a "reduction-in-force" were eligible for severance benefits, those who voluntarily separated unrelated to any reduction in force were not. Therefore, because Honeywell coded Dr. Varghese's termination as "voluntary," he was not considered eligible for severance benefits. When no action was taken pursuant to Dr. Varghese's requests to obtain his accrued separation benefits and to exercise his stock options, he brought the instant suit. Through a series of amended complaints Dr. Varghese alleged various claims, including the violation of Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Employee Retirement Income Security Act of 1974 ("ERISA"), and the MWP&CL.

After cross motions for summary judgment, the following claims remained: 1) that Honeywell violated ERISA's notice requirements by not responding to Dr. Varghese's fall of 1999 requests for information about his 401K plan until mid-2000, thereby breaching its fiduciary duty;[5] 2) that Honeywell's failure to pay Dr. Varghese separation pay constituted a breach of contract in violation of Maryland common law and the MWP&CL;[6] 3) that Honeywell breached its contractual obligations by retroactively terminating Dr. Varghese's right to exercise his stock options in violation of Maryland common law and the MWP&CL; and 4) that an enforceable contract existed between Dr. Varghese and Honeywell under Honeywell's supplemental savings plan.

---

[5]This issue was not presented to the jury because under ERISA a claimant may not insist upon a jury trial. *See Phelps v. C.T. Enterprises, Inc.*, 394 F.3d 213, 222 (4th Cir. 2005)

[6]The district court granted Honeywell's summary judgment motion on Dr. Varghese's ERISA claim for separation pay, ruling that Honeywell's separation plan was not a plan covered by ERISA. This ruling, in combination with the denial of summary judgment on Dr. Varghese's state law separation claims, stands as an implicit rejection of Honeywell's summary judgment argument that ERISA preempted Dr. Varghese's state law claims.

These four claims proceeded to trial. At the end of Dr. Varghese's case in chief, Honeywell moved for Judgment as a Matter of Law ("JMOL") pursuant to Fed. R. Civ. P. 50(a)(1) arguing: 1) that a contract for supplemental severance pay never existed; 2) that the stock options in this case do not constitute "wages" under the MWP&CL; and 3) that Honeywell did not breach the stock options contract.[7] The district court granted the Rule 50 motion with regard to the supplemental severance claim and denied it in all other respects.

On March 26, 2004 the jury returned a verdict for Dr. Varghese, awarding him $337,000 on the stock options claim, $25,571 on the separation pay claim, and $6,711 in prejudgment interest.[8] Finally, on September 3, 2004, the district court entered an order finding that Honeywell had in fact violated ERISA § 502(a)(1)(A), and awarded Dr. Varghese an additional $2600.00.

From these decisions, Honeywell brings this appeal.

II.

A.

Honeywell first challenges the district court's denial of its motion for judgment as a matter of law on Dr. Varghese's stock option claim. Under Fed. R. Civ. P. 50(a)(1), "[i]f during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party." Fed. R. Civ. P. 50(a)(1). We review the denial of a motion for judgment as a matter of law *de novo*, viewing the evidence in the light most favorable to

---

[7]Honeywell argues that it also raised the issue of whether separation pay was subject to the MWP&CL. However, such a contention is not supported by the transcript of the JMOL hearing at trial.

[8]These damages were enhanced by the MWP&CL. Specifically, under § 3-507.1 of the MWP&CL, if "a court finds that an employer withheld the wage of an employee in violation of the subtitle and not as a result of a bona fide dispute, the court may award the employee an amount not exceeding 3 times the wage, and reasonable counsel fees and other costs." MD Code Ann., Lab. & Employ., § 3-507.1(a) (2004).

the nonmovant, and "draw[ing] all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Ocheltree v. Scollon Prod., Inc.*, 335 F.3d 325, 331 (4th Cir. 2003) (quoting *Anderson v. G.D.C., Inc.*, 281 F.3d 452, 457 (4th Cir. 2002)). Judgment as a matter of law is proper only if "there can be but one reasonable conclusion as to the verdict." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).

### B.

In its challenge to the district court's denial of its JMOL motion, Honeywell argues that the stock options were not "wages" as that term is defined by the MWP&CL because Dr. Varghese was never promised stock options as remuneration for his labor. As such, Honeywell contends that the jury's award of enhanced damages for breach of the stock option contracts under the MWP&CL was improper. We agree.[9]

Pursuant to the MWP&CL:

> each employer shall pay an employee or the authorized representative of an employee all wages due for work that the employee performed before the termination of employment, on or before the day on which the employee would have been paid the wages if the employment had not been terminated.

MD Code Ann., Lab. & Employ., § 3-505 (2004). The statute defines "wages" as "all compensation that is due to an employee for employment." *Id.* at § 3-501(c)(1). According to § 3-501(c)(2), the term "wage" includes "a bonus," "a commission," and "a fringe benefit." *Id.* at § 3-501(c)(2). Critically, § 3-501(c)(2)(iv) additionally defines "wages" as "any other remuneration *promised* for service." *Id.* at § 3-501(c)(2)(iv) (emphasis added).

---

[9]Honeywell also contends that the stock options did not constitute "wages due" to Dr. Varghese under the MWP&CL. Because we agree with Honeywell that the stock options awarded to Dr. Varghese were not "wages" as that term is defined by the statute, we do not reach this argument.

The Maryland Court of Appeals encountered this provision of the MWP&CL in *Whiting-Turner Contracting Co. v. Fitzpatrick*, 783 A.2d 667, 669 (Ct. App. Md. 2001). Joe Fitzpatrick was hired by Whiting-Turner in 1997, and it was agreed that his compensation would consist of a weekly salary "and, after two years of employment and depending upon the profitability of the company, profit sharing." *Id.* When Fitzpatrick informed a company vice-president that he was considering leaving the firm in late 1998 and inquired about the status of his profit sharing bonus, the vice-president responded: "I have a profit sharing check for you in my pocket. All you have to do is tell me you are staying." *Id.* Fitzpatrick resigned that next Monday, prior to reaching two years of employment with Whiting-Turner. *Id.* When he was not given a profit sharing bonus, he brought suit. *Id.*

Interpreting the MWP&CL, the court held that "the wages which an employee is due, and which must be paid on termination of employment, consist of all compensation, and any other remuneration, *that the employee was promised in exchange for his work.*" *Id.* at 671-72 (emphasis added). Specifically, the court found that "§ 3-501(c)(2)(iv) serves two functions: it makes clear both that the listed forms of remuneration are simply examples, by the use of the phrase 'any other remuneration,' and that the 'other remuneration' that may be included in—in order to be considered—wages must have been 'promised for service.'" *Id.* at 672. The court stated:

> reading the statute as including a bonus as wages only when it has been promised as part of the compensation for employment is logical and makes good common sense. The conditions of employment are determined in advance of the employment. What, if anything beyond the basic salary, the employee will receive is a matter for discussion, consideration and agreement. If a bonus is to be made part of the wage package, it can be negotiated and included in what has been promised. . . . Once a bonus, commission or fringe benefit has been promised as a part of the compensation for service, the employee would be entitled to its enforcement as wages.

*Id.* at 672. Because the compensation package made no provision for a bonus given before the end of two years, any such bonus would

have been merely a gift or a gratuity that Fitzpatrick was not entitled to, and therefore not a "wage" covered by the MWP&CL. *See id.*

The Maryland Court of Appeals soon had opportunity to apply this holding in *Medex v. McCabe*, 811 A.2d 297 (Md. Ct. of App. 2002). There Timothy McCabe, a former sales representative for Medex, brought suit against Medex seeking to recover wages and incentive fees (i.e., commissions) under the MWP&CL. *Id.* at 300. McCabe earned a salary of $49,000.00 plus incentive fees. *Id.* According to McCabe's employee manual, "[p]ayment from all Company incentive compensation plans is conditional upon meeting targets and the participant being an employee at the end of the incentive plan (generally the fiscal year) *and being employed at the time of actual payment*." *Id.* McCabe resigned his position after the end of the fiscal year, but prior to the time of actual payment. When Medex refused to pay the incentive fees, McCabe filed suit. *Id.* at 301.

The *Medex* court began by stating that the exchange of remuneration for an employee's work is the critical inquiry in the determination of whether compensation constitutes a wage. *Id.* at 302. "Where the payments are dependent upon conditions other than the employee's efforts, they lie outside of the definition." *Id.* According to the *Medex* court, this situation was distinguishable from the requested accelerated bonus in *Whiting-Turner* which was not "promised for service" because:

> the incentive fees were related directly to sales made by the employees during a defined fiscal year. McCabe had performed all the work necessary to earn the fees, and Medex had registered the sales. In the terminology of the incentive plan itself, some of the incentive fees "*begin to earn*" at meeting 80% of a target goal, while another "*[i]ncentive begins*" upon the sale of certain goods.

*Id.* at 302-03 (emphasis added). Because the incentive fees were part of McCabe's promised compensation for work performed, and because McCabe had performed all the work necessary to earn the fees, the court held that they were "wages" to which McCabe was entitled. *See id.* at 301, 303.

Reading the MWP&CL and Maryland case law[10] on this issue, it is clear that for a form of compensation to constitute "wages" under the MWP&CL, and therefore be subject to the MWP&CL enhanced damages provisions, the employee must have been *promised* the particular form of compensation as remuneration for his labor. The *Whiting-Turner* court's interpretation of § 3-501(c)(2)(iv) is critical in that regard. According to *Whiting-Turner*, § 3-501(c)(2)(iv) sets forth the general governing principle that remuneration can only constitute wages where it is promised for service. *See Whiting-Turner*, 783 A.2d at 672. §§ 3-501(c)(2)(i)-(iii) merely put forth a non-exhaustive list of examples that can meet that criteria. *See id.* The *Whiting-Turner* court emphasized this point when it stated that "reading the statute as including a bonus as wages only when it has been promised as part of compensation is logical and makes good common sense." *Id.* As such, even if the stock options in this case were a "fringe benefit," or a "bonus," they still must have been promised to Dr. Varghese as remuneration in order to qualify as "wages."

Dr. Varghese contends that because the options were granted as remuneration for service, they constitute "wages."[11] We recognize that

---

[10]Dr. Varghese cites much external authority to support his proposition that the stock options in this matter constitute wages under the MWP&CL. However, we do not believe that any of these cases are particularly helpful on this issue. In *Scully v. U.S. Wats, Inc.*, 238 F.3d 497 (3rd Cir. 2001), and *Reiger v. Rhone-Poulenc Roer, Inc.*, Civ. A. No. 93-4821, 1995 WL 395948, at *6-7 (E.D. Pa. June 30, 1995), the equivalent Pennsylvania statute does not use the term "promise" to define wages. That statute defines "wages" as including "all earnings of an employee, regardless of whether determined on time, task, piece, commission, or other method of calculation. The term 'wages' also includes fringe benefits or wage supplements whether payable by the employer from his funds or from amounts withheld from the employees pay by the employer." 43 Pa. Stat. Ann. § 260.2a (1992). Similarly, the Colorado Wage Claim Act section defining "wages" interpreted in *Montemayor v. Jacor Communications, Inc.*, 64 P.3d 916 (Colo. Ct. App. 2002), did not employ language similar to the "promise" language employed by the MWP&CL.

Because "wage" is explicitly defined differently by the Maryland statute at issue, these cases do not mandate a different result here.

[11]Honeywell contests this, arguing that the options were based an employee's future potential to contribute. Appellant's Brief 19.

stock options are commonly used as compensation tools. We further recognize that the grant of stock options in this matter was, in all likelihood, at least partially remuneration for Dr. Varghese's past performance. However, mere remuneration, while necessary, is not sufficient to prove that a particular form of compensation constituted "wages" under the MWP&CL. Under Maryland law, the test to determine whether a particular form of compensation constitutes "wages" under the MWP&CL contains a promise element as well. Thus, the issue before us is whether these particular stock option grants were *promised* to Dr. Varghese as remuneration for his efforts in his employment agreement.[12]

*Whiting-Turner* and *Medex* focused on the existence of an employment agreement laying out the terms of compensation to establish the existence, or non-existence, of a "promise." In *Whiting-Turner*, the court explicitly noted that "[h]ad the respondent been with the petitioner for two years when the decision was made to offer him a bonus and had the financial condition of the petitioner justified it, there would be no doubt of the respondent's entitlement . . . because sharing in the profits of the company after two years was *promised* as part of the respondent's compensation package." *Id.* at 673 (emphasis added). Because the parties did not agree to an accelerated bonus, any such accelerated bonus could not constitute "wages" under the MWP&CL.

By contrast, in *Medex*, where "Medex *represented* these incentive fees as a portion of the employee's 'Total Target Cash Compensation,'" and represented that the "incentive fees were supplemental to the fixed salary as a combined measure of compensation," the court found that the incentive fees constituted "wages" under the MWP&CL. *Medex*, 811 A.2d at 306 (emphasis added). There, the satisfaction of three conditions, agreed upon at that outset of the employment relationship, provided a measurable benchmark to determine whether one was entitled to receive incentive compensation. *See id.*

The record in this case is unequivocal that no such promise, outright or conditional, existed. As an initial matter, we note that Dr. Varghese repeatedly testified that Honeywell never promised him

---

[12]This includes any legal cognizable amendments to this agreement.

stock options as a part of his compensation package.[13] Further, Dr. Varghese's employment documents that set forth his compensation package made no explicit mention of stock options. Although the "Salaried Employees Compensation Agreement" makes clear that Dr. Varghese's compensation package includes any additional compensation comparable employees may be entitled to, the "Total Compensation and Incentive Pay" summary document makes clear that band 4 employees "*may*" also be included in the annual incentive plan, and "*may*" receive stock option grants.[14] Read together, these documents show that while Dr. Varghese was *eligible* to receive stock options, at no point was he *entitled* to them.

---

[13]During his deposition, Dr. Varghese testified as follows:

"Q: You weren't guaranteed stock options in any given year, were you?

A: I was not guaranteed a stock option, but it was customary practice that if you're involved in winning contracts, from the precedence that was established, I was eligible for stock options in 1998."

J.A. 247-48 (Deposition Transcript of Thomas Varghese, February 12, 2003).

At trial, Dr. Varghese testified as follows:

"Q: Dr. Varghese, did you have any promise that you would receive stock options as part of your compensation at Allied Signal?"

A: No Promise."

Q: I'm sorry?

A: I did not have any promise, written promise.

Q: Did anyone ever guarantee you stock options?

A: No, there's no guarantee."

J.A. 457-58 (Transcript of Thomas Varghese Trial Testimony, March 24, 2004).

[14]We note here that the operative language used in the "Total Compensation and Incentive Pay" summary document, namely the word "may," is markedly different from the language employed by the contract in *Medex*, which speaks about fees being "earned" and incentives "beginning." *See Medex*, 811 A.2d at 302-03. In *Medex*, McCabe "earned" the incentive fees and was therefore entitled to them. *See Medex*, 811 A.2d at 302-03.

Importantly, no document or testimony sets forth any conditions that, once satisfied, would convert mere eligibility to entitlement. In *Medex*, the "incentive fees 'beg[a]n to earn' at meeting 80% of a target goal." *Medex*, 811 A.2d at 302-03. There, meeting [sales] targets constituted a measurable benchmark, by which an employee could demonstrate that he was entitled to the incentive fees at issue.[15] Here, there were no such conditions or measurable benchmarks. No matter what Dr. Varghese did in his professional capacity, Honeywell always retained the discretion to not nominate Dr. Varghese to receive stock options. In fact, Honeywell could have nominated the entire company except Dr. Varghese and been in complete compliance with Dr. Varghese's employment contract. This is exemplified by the fact that Dr. Varghese only received four stock option grants during his sixteen years at Honeywell. Such discretion counsels against construing the stock option grants at issue as "wages." An employer cannot decide to not pay an employee the "wages" that employee has earned. Nor can an employer claim that earned "wages" have somehow expired based on the reason it terminated an employee.[16] The fact that Honeywell could always decide to simply not grant Dr. Varghese stock options, coupled with the fact that the stock options expired upon an employee's voluntary termination, counsels against defining the stock option grants in this case as "wages."

Finally, we would note that the mere fact that the stock options were granted does not convert them from a form of a gratuity or reward to "wages" that must be paid. Under that logic, any and all forms of compensation, once granted, would constitute "wages." Maryland law applies a much narrower brush, defining wages as compensation *promised* to an employee as remuneration for that employee's labor. As such, it is possible for additional compensation to be granted without it being termed a "wage." The Maryland courts have explicitly focused on the idea that "the conditions of employment are determined in advance of the employment." The universe of what is promised as a "wage" for each individual employee is defined by all

---

[15]Similarly, in *Whiting-Turner*, two years and company profitability provided a means of measurement. *See Whiting-Turner*, 783 A.2d at 669.

[16]However, this is exactly what would happen under the stock options contract, under which all stock options granted to any employee terminated for cause expired on the date of termination.

the documents constituting the employment agreement and setting forth the terms of the employment relationship. "Wages" are not defined *ex post facto*, viewing the actual grant as the penultimate indication of whether a form of compensation constitutes a "wage." The grant of a form of compensation not contained in the employment agreement is not a "wage" because it was not promised. The MWP&CL protects the proper expectation of promised remuneration. Where there is no promise, there can be no proper expectation. Defining "wage" as the Maryland courts have advances that goal.

Because the facts of this case reveal no such promise, outright or conditional, nor show the existence of any measurable benchmark by which Dr. Varghese could demonstrate that he was entitled to receive stock options, we find that the options in this case were not "wages" under the MWP&CL and therefore were not subject to the MWP&CL's enhanced damages provisions.

## III.

Honeywell next argues that the district court erred when it denied summary judgment on Dr. Varghese's state law separation pay claims because its separation plan is covered by ERISA which preempts state law. In response, Dr. Varghese argues that Honeywell's ERISA preemption argument is not properly before this Court because, under *Chesapeake Paper Products Co. v. Stone & Webster Engineering Corp.*, 51 F.3d 1229 (4th Cir. 1995), we do not review pre-trial denials of summary judgment after a full trial and final judgment on the merits. Honeywell counters that because this appeal centers around a legal issue, a motion for judgment as a matter of law was not the proper avenue for such a challenge. Therefore, Honeywell argues that this appeal of the district court's pre-trial denial of summary judgment is properly before this court. We do not find Honeywell's argument convincing.

In *Chesapeake*, we held "that this Court will not review, under any standard, the pretrial denial of a motion for summary judgment after a full trial and final judgment on the merits." *Id.* at 1237. In that case, Stone and Webster ("S&W") moved the district court for partial summary judgment, requesting that "the court rule as a matter of law that the rights and liabilities of the parties were governed by the Engineer-

ing Contract, as amended on January 16-17, 1992, by Amendment #1 . . . ." *Id.* at 1231. The district court denied this motion, and proceeded to trial on the proper interpretation of the contract. *Id.* at 1233. After Chesapeake's case in chief, the district court denied S&W's motion for judgment as a matter of law and the jury ruled in favor of Chesapeake. *Id.* at 1233.

We began our analysis of S&W's appeal by noting that eight circuit courts had recently adopted the rule that the denial of summary judgment is not reviewable on appeal after a full trial on the merits. *Id.* (citing *Watson v. Amedco Steel, Inc.*, 29 F.3d 274, 277-78 (7th Cir. 1994); *Black v. J.I. Case Co.*, 22 F.3d 568, 570-72 (5th Cir. 1994); *Johnson Int'l Co. v. Jackson Nat'l Life Ins. Co.*, 19 F.3d 431, 434 (8th Cir. 1994); *Lama v. Borras*, 16 F.3d 473, 476 n. 5 (1st Cir. 1994); *Whalen v. Unit Rig, Inc.*, 974 F.2d 1248, 1250-51 (10th Cir. 1992); *Jarrett v. Epperly*, 896 F.2d 1013, 1016 (6th Cir. 1990); *Locricchio v. Legal Services. Corp.*, 833 F.2d 1352, 1358-59 (9th Cir. 1987); *Glaros v. H.H. Robertson Co.*, 797 F.2d 1564, 1573 & n. 14 (Fed. Cir. 1986)). Next, we rejected the "contention that our review should depend on whether the party claims an error of law or an error of fact" because: 1) all summary judgment decisions are legal decisions because they do not rest on disputed facts; and 2) this court should not "engage in the dubious undertaking of determining the bases on which summary judgment is denied and whether those bases are 'legal' or 'factual.'" *Id.* at 1235. We continued on to note that:

> Reviewing a pretrial denial of summary judgment after a full trial is inappropriate because the denial was based on an undeveloped, incomplete record, which was superceded by evidence adduced at trial. Even when the pretrial record and the trial testimony are identical, a judgment after a full trial is superior to a pretrial decision because the factfinder's verdict depends on credibility assessments that a pretrial paper record simply cannot allow.

*Id.* at 1236 (citations omitted).

We further found that bifurcating summary judgment decisions is unnecessary because a party "has adequate remedies other than seeking review of the denial after a full trial." *Id.* at 1236. First, the party

may move for a judgment as a matter of law under Fed. R. Civ. P. 50 and then seek appellate review of the motions if they are denied. *Id.* at 1236. Importantly, we stated that "a party may appropriately move for judgment as a matter of law on discrete *legal issues*" even where the legal issue may not be entirely dispositive of a claim or defense. *Id.* at 1236 (emphasis added). Additionally, we noted that a party may "move the court to certify the denial for interlocutory appeal pursuant to 28 U.S.C. § 1292(b)." *Id.* at 1237. As a result, we concluded that we would not review a pretrial denial of a motion for summary judgment after a full trial and final judgment on the merits. *Id.*; *see Benner v. Nationwide Mutual Ins. Co.*, 93 F.3d 1228, 1233 (4th Cir. 1996) (citing *Chesapeake* for the proposition that "[b]ecause there was a full trial and final judgment on the merits, we may not review the district court's pretrial denial of summary judgment").

In the instant case, Honeywell moved for summary judgment prior to trial on all of Dr. Varghese's claims, including the issue of whether Honeywell's failure to pay Dr. Varghese separation pay constituted a breach of contract in violation of Maryland common law and the MWP&CL. At the summary judgment hearing, Honeywell argued that these claims were preempted by ERISA. For example, the following exchange took place between the court and defense counsel:

> The Court: Well leaving aside the question of futility, but if he can assert this claim under ERISA, isn't his breach of contract claim preempted? . . .
>
> Ms. Weiss: Yes. The separation pay is preempted by ERISA, because it deals with a welfare benefit program for the plaintiff. So that therefore it is preempted by ERISA, and he has not exhausted any administrative remedies under ERISA to obtain a separation pay.

J.A. 318. In ruling on Honeywell's summary judgment motion, the district court noted that "plaintiff seeks a recovery of separation or severance pay both under ERISA and under Maryland common law. If plaintiff were entitled to recover separation pay under ERISA, his claim under state law would presumably be preempted." J.A. 58. Ultimately, the district court denied Honeywell's summary judgment motion on the Maryland common law and MWP&CL separation pay

claims, allowing them to go to trial, and granted Honeywell's motion for summary judgment on Dr. Varghese's ERISA separation pay claim, ruling that Honeywell's separation plan was not subject to ERISA.[17] At the close of Dr. Varghese's case in chief, Honeywell moved for JMOL, but it did not raise the ERISA preemption argument. After a full trial on the merits the jury returned a verdict for Dr. Varghese and the court entered a final judgment on September 3, 2004.

Here, Honeywell seeks appellate review of a district court's denial of summary judgment after a full trial and final judgment. However, under binding circuit precedent, this is exactly the type of situation in which appellate review is not available. Recognizing this problem, Honeywell attempts to extricate itself from underneath the *Chesapeake* umbrella. Specifically, Honeywell argues that the ERISA preemption issue was not raised in its JMOL motion because such motions challenge the sufficiency of the evidence presented by an opposing party at trial. As such, Honeywell contends a JMOL motion was not the appropriate avenue for its legal challenge and that appellate review of the pretrial denial of summary judgment is therefore proper.

However, these arguments were addressed in *Chesapeake*. Again, we *expressly rejected* "the contention that our review should depend on whether the party claims an error of law or an error of fact." *Chesapeake*, 51 F.3d at 1235. In fact, we stated that although a dichotomy between reviewing denials of summary judgment based on an erroneous legal conclusion and those based on an erroneous factual determination "is supported by the reasoning in *Holley* [*Holley v. Northrop Worldwide Aircraft Serv.*, 835 F.2d 1375, 1378 (11th Cir. 1988)] . . . we decline to follow *Holley* and therefore need not describe specific circumstances in which this Court would review the denial of summary judgment after trial." *Id.* at 1235 n.8. In other words, the *Chesapeake* Court did not need to discuss "specific circumstances" because there are none. The express rejection of *Holley*, a case that supported such a dichotomy, makes that point clear. At no point does the opinion suggest otherwise.

---

[17]As was previously noted, this ruling inherently addressed Honeywell's ERISA preemption argument.

We recognize that several other circuits have taken a different approach on this issue, allowing appeals from a denial of summary judgment after a trial where the summary judgment motion raised a legal issue and did not question the sufficiency of the evidence. *See, e.g., Pavon v. Swift Transp. Co.*, 192 F.3d 902 (9th Cir. 1999); *Rekhi v. Wildwood Industries, Inc.*, 61 F.3d 1313 (7th Cir. 1995). However, as the Seventh Circuit noted in *Chemetall GMBH v. ZR Energy, Inc.*, 320 F.3d 714, 721 (7th Cir. 2003), their approach simply conflicts with our own. There, the Seventh Circuit expressly noted the disagreement stating: "[t]he Fourth Circuit, however, has rejected *any* distinctions between factual and legal issues like the one we drew in *Rekhi*, holding that in either case, review of the district court's denial of summary judgment is barred after trial." *Id.*

In *Chesapeake*, we concluded that we would not review a district court's pretrial denial of summary judgment after a full trial and final judgment on the merits. *See Chesapeake*, 51 F.3d at 1237; *see Rhoades v. Federal Deposit Insurance Corp.*, 257 F.3d 373 (4th Cir. 2001); *Benner v. Nationwide Mutual Ins. Co.*, 93 F.3d 1228 (4th Cir. 1996). After the denial of Honeywell's summary judgment motion, there was a full trial and final judgment on the merits. Honeywell had the option to move for judgment as a matter of law (the denial of which we will review), arguing that ERISA preempted Dr. Varghese's state law separation pay claims. As we noted in *Chesapeake*, "a party may appropriately move for judgment as a matter of law on discrete *legal* issues." *Id.* at 1236 (emphasis added). Although Honeywell moved for judgment as a matter of law, they did not so move on this issue and therefore failed to preserve it for appeal. Therefore, binding circuit precedent mandates that the appeal be dismissed.[18]

IV.

Given our finding that the stock options in this case did not constitute "wages" as that term is defined by the MWP&CL, we reverse in

---

[18]Of course, this outcome does not address the merits of Honeywell's preemption claim. However, this Court has often applied procedural rules in criminal matters where a person's life is literally at stake and not reached the merits of the claim. The instant matter is no different.

part the judgment of the district court, vacate in part the jury award to Dr. Varghese, and remand to the district court for redetermination.

*AFFIRMED IN PART, REVERSED AND VACATED IN PART, AND REMANDED IN PART*

DIANA GRIBBON MOTZ, Circuit Judge, concurring in part and dissenting in part:

I concur in Parts I and II of Judge Gregory's opinion for the court, holding that the stock options Honeywell granted to Dr. Varghese did not constitute "wages" under the Maryland Wage Payment & Collection Law, Md. Code Ann., Lab. & Employ., § 3-501 *et seq.* (2004) ("MWP&CL" or "the Act"). However, because I believe that Honeywell's argument that ERISA preempts Dr. Varghese's state law separation pay claim is properly before us, I respectfully dissent from Part III.

I.

I agree with Judge Gregory's analysis and resolution of Dr. Varghese's stock option claim. In interpreting the MWP&CL's definition of "wages," the Maryland Court of Appeals has focused on whether the options were promised as remuneration for services rendered. *See Whiting-Turner Contracting Co. v. Fitzpatrick*, 783 A.2d 667, 671-72 (Md. 2001) ("[T]o be wages [within the statute], the payment must have been promised to the employee as compensation for work performed."); *see also Medex v. McCabe*, 811 A.2d 297, 302-03 (Md. 2002).

These cases indicate that, while it is crucial that the benefit at issue is remuneration for work performed, it is equally crucial that the compensation was "promised as part of the compensation for employment." *Whiting-Turner*, 783 A.2d at 672. Moreover, *Whiting-Turner* holds that this promise must be included *in the compensation package. See id.* (asserting that the compensation to be paid is a matter "for agreement in advance of the employment or to become a part of the undertaking during the employment").

Dr. Varghese does not contend that Honeywell promised to grant him stock options as part of the employment agreement negotiated and agreed upon either in advance of or during the tenure of his employment. Indeed, he admits that Honeywell never promised him options. Consequently, because a promise to grant stock options was not part of the "conditions of employment," *id.*, Dr. Varghese's options do not constitute "wages" under the MWP&CL.

Thus, Judge Hamilton's contention that, "once Honeywell actually granted Dr. Varghese the stock options with the concomitant promises that he could exercise them . . . , Dr. Varghese's *right to exercise* those options . . . constituted 'remuneration promised for service,'" *post* at 29, though interesting, misses the mark. Because the grant of stock options was "not a part of the compensation package promised," *Whiting-Turner*, 783 A.2d at 673, the mere fact that the options, once granted, could be exercised in accordance with their terms does not convert them into "wages" under the MWP&CL. Indeed, because *all* stock options include a "promise" that they can be exercised in accordance with their terms, the position advocated by the dissent would transform every grant of stock options by an employer to an employee — no matter how unexpected and voluntary — into "wages" under the Act. This result "would read out of the statute the words 'promised for service.'" *Id.* at 672. Controlling precedent from Maryland's highest court prohibits this interpretation.

## II.

I disagree, however, with the conclusion in Part III of Judge Gregory's opinion that binding circuit precedent, specifically *Chesapeake Paper Products Co. v. Stone & Webster Engineering Corp.*, 51 F.3d 1229 (4th Cir. 1995), forecloses our review of the district court's rejection of Honeywell's ERISA preemption defense at the summary judgment phase. In so holding, the majority ignores the critical differences between *Chesapeake* and the case at hand. Thus, rather than simply following the entirely proper rule we adopted in *Chesapeake*, the majority imprudently expands that rule. The important policy justifying the *Chesapeake* rule provides no support at all for this expansion. For these reasons, I would join most of our sister circuits in rejecting such an expansion.

In *Chesapeake* the district court denied Stone & Webster's motion for summary judgment on a contract claim because it found that Chesapeake had presented sufficient evidence to create "genuine issues of material fact regarding the formation of the contract and ultimately the proper interpretation of what one finds to be the contract between the parties." *Id.* at 1233 (internal quotation marks omitted). The case proceeded to trial, which concluded with a verdict for Chesapeake. Without filing Rule 50 motions for judgment as a matter of law, Stone & Webster sought review of the summary judgment denial on appeal. In refusing to review that ruling, we reasoned that "[r]eviewing a pretrial denial of summary judgment after a full trial is inappropriate because the denial was based on an undeveloped, incomplete record" that was examined not to "settle or even tentatively decide anything about the merits of the claim," but only to decide whether or not "the case should go to trial." *Id.* at 1236 (internal quotation marks and citations omitted). Permitting appellate review of a summary judgment denial in such circumstances would "deprive a party of a jury verdict after the evidence was fully presented, on the basis of an appellate court's review of whether the pleadings and affidavits at the time of the summary judgment motion demonstrated the need for a trial." *Id.* at 1237 (internal quotation marks and citation omitted). Thus, once a trial has occurred, a party must make an appropriate Rule 50 motion to preserve a challenge on appeal to the sufficiency of the evidence. *See id.* at 1236.

This is a sound rule, which, as we noted in *Chesapeake*, many of our sister circuits have adopted. *See id.* at 1234. The majority, however, apparently concludes that *Chesapeake* holds that an appellate court can *never* review a district court's denial of summary judgment after a full trial. But *Chesapeake* does not hold this; indeed, it clearly implies the contrary. The *Chesapeake* court carefully noted that it did not need to describe the "specific circumstances in which this Court would review the denial of summary judgment after a full trial." *Id.* at 1235 n.8. Such a notation would be unnecessary if no such "circumstances" existed.

A case, like the one at hand, in which the sole basis of the district court's denial of summary judgment was *rejection of a purely legal defense* — here preemption — obviously presents such a "circumstance." The evidentiary concerns discussed in *Chesapeake* are simply

not at issue when a party seeks to reassert on appeal a legal *defense* that the court below rejected at the summary judgment stage.

The Seventh Circuit made precisely this point in *Rekhi v. Wild-wood Industries, Inc.*, 61 F.3d 1313 (7th Cir. 1995). There the defendant argued that summary judgment was appropriate because another legal defense — *res judicata* — barred the plaintiff's claim. The *Rekhi* court recognized that if a trial court denied summary judgment merely on the ground that the nonmoving party had presented sufficient evidence to take the case to trial, it would be unjust for an appellate court to review that denial after "the plaintiff went on to present at trial enough evidence to show that he [was] entitled to win his suit." *Id.* at 1318. However, the court went on to explain that there is no unfairness in allowing a party to reassert on appeal *a legal defense* rejected as a basis for summary judgment (e.g., res judicata, statute of limitations, immunity, preemption) because by definition a legal defense provides a basis to avoid liability for an otherwise meritorious claim. *Id.* Even when a plaintiff has sufficient evidence to escape summary judgment and proceed to trial, a legal defense may entitle a defendant to the award of summary judgment. A subsequent trial verdict for the plaintiff does not change that fact.

As Judge Posner explained in *Rekhi*, "[t]he injustice would be" to deny the party moving for summary judgment on the basis of a legal defense the opportunity to reassert that defense on appeal because "most defenses . . . would have no function if all [they] did was bar *meritless* suits." *Id.* Accordingly, a defense must "remain[ ] available . . . even when the plaintiff, having survived summary judgment, goes on to win a judgment on the merits." *Id.* (citing cases). "Defenses are not extinguished merely because" they are "denied at the summary judgment stage." *Id.* Rather, "[i]f the plaintiff goes on to win [at trial], the defendant can reassert the defense on appeal." *Id.*

For this reason, many of our sister circuits, including five of the eight on which we relied in *Chesapeake*, have specifically refused to extend the *Chesapeake* rule the way the majority does here. Indeed, they allow review of the denial of summary judgment if the denial was based on a pure question of law, rather than a determination as to evidentiary sufficiency. *See, e.g.*, *Rothstein v. Carriere*, 373 F.3d 275, 284 (2d Cir. 2004) ("A critical distinction exists between sum-

mary judgment motions raising the sufficiency of the evidence to create a fact question for the jury and those raising a question of law that the court must decide. Where a motion for summary judgment based on an issue of law is denied, appellate review of the motion is proper even if the case proceeds to trial and the moving party fails to make a subsequent Rule 50 motion.") (internal quotation marks omitted); *Chemetall GMBH v. Zr Energy, Inc.*, 320 F.3d 714, 719 (7th Cir. 2003); *Pavon v. Swift Transp. Co.*, 192 F.3d 902, 906 (9th Cir. 1999); *White Consol. Indus. v. McGill Mfg. Inc.*, 165 F.3d 1185, 1189-90 (8th Cir. 1999); *McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997); *Ruyle v. Continental Oil Co.*, 44 F.3d 837, 841-42 (10th Cir. 1994).[1]

Here, we need not go so far as to allow review of all questions of law decided at summary judgment, and I see no reason to adopt this view in the case at hand. *But see supra* note 1. I would hold, however, that when, as here, a district court denies a motion for summary judgment based entirely on a legal *defense*, a subsequent trial does not eliminate the movant's right to assert that defense on appeal. Substantial authority supports appellate review in these circumstances, *see, e.g., Rekhi*, 61 F.3d at 1318 (res judicata); *Ruyle*, 44 F.3d at 841-42 (collateral estoppel); *see also Paschal v. Flagstar Bank, FSB*, 295 F.3d 565, 571-72 (6th Cir. 2002) (statute of limitations); *Lenz v. Dewey*, 64 F.3d 547, 550 (10th Cir. 1995) (qualified immunity), and the majority has failed to cite a single case that rejects it. Certainly the rule articulated in *Chesapeake* does not prohibit (nor does the dicta in that case counsel against) such review. Indeed, as many of our

---

[1]Although some dicta in *Chesapeake* disapproves the reasoning in these cases, *see Chesapeake*, 51 F.3d at 1235-36, contrary to the suggestion in *Chemetall*, 320 F.3d at 721, *Chesapeake*'s actual holding does not prohibit such a rule. *Chesapeake* involved the review of a denial of summary judgment on the ground that the plaintiff had presented sufficient evidence to go to trial. *See id.* at 1233. While defendant Stone & Webster "claim[ed] that its motion sought partial summary judgment on a discrete legal issue, . . . in actuality, its motion sought resolution of the conflicting factual inferences from the competing contract documentation on the central issue of which document governed the rights and liabilities of the parties." *Id.* at 1235. Thus, despite its dicta, the holding in *Chesapeake* would not prevent us from adopting in a future case the view espoused by many of our sister circuits.

sister circuits have held, the rationale for the *Chesapeake* rule simply does not support the unwise and unjust expansion of that rule articulated by the majority.[2]

HAMILTON, Senior Circuit Judge, concurring in part and dissenting in part:

While I fully agree with the holding in Part III of Judge Gregory's opinion that Honeywell is not entitled to appellate review of the judgment below with respect to Dr. Varghese's state law separation pay claims, I strongly disagree with the holding in Part II.B. of Judge Gregory's opinion that Dr. Varghese was not entitled to enhanced damages under the Maryland Wage Payment and Collection Law (the MWP&CL), Md. Code, Labor & Employment, §§ 3-501 to 3-509, with respect to his stock option claims. Accordingly, I concur in Part III of Judge Gregory's opinion, but dissent from Part II.B. of that opinion, concurred in by Judge Motz. I would affirm the judgment below *in toto*.

I.

The operative stock option plan in this case declared as follows:

> The Company desires to attract and retain the best available talent and to encourage the highest level of performance by its employees. By affording employees the opportunity to acquire an equity interest in the Company and by providing them incentives to put forth maximum efforts for the success of the Company's business, the Plan is expected to contribute to the attainment of those objectives.

---

[2]Refusing Honeywell the right to assert its legal defense on appeal works a particular injustice because its preemption defense is, in fact, meritorious. ERISA does preempt Dr. Varghese's state law severance pay claim because Honeywell's separation plan requires an ongoing administrative scheme not triggered by a single one-time event but by the termination for one of three reasons of *any* salaried employee. *See, e.g.*, *Fort Halifax Packing Co., Inc. v. Coyne*, 482 U.S. 1, 14 n.9 (1987); *Bowles v. Quantum Chem. Co.*, 266 F.3d 622, 631-33 (7th Cir. 2001) (and the cases cited therein).

(J.A. 187). With regard to stock option granting decisions, the same plan provided that Honeywell's Management Development and Compensation Committee (the Committee) would "base its selection of award recipients, among other things, on the duties of the employees and their present and potential contributions to the Company's success." (J.A. 188). In this vein, the record contains the trial testimony of Honeywell Executive Compensation Analyst Katherine Behre (Behre) to the effect that an employee at Dr. Varghese's level, *i.e.*, band four, is nominated for a stock option grant based upon two factors: (1) the employee's performance and (2) as an inducement to the employee's future contributions to the company. Similarly, Mary Neville, a twenty-year veteran of Honeywell who served as Honeywell's Human Resources Manager at all times relevant to this appeal, testified at trial that stock option grants depended upon employee performance and the potential for future contributions to the company. She also confirmed that "[s]tock options are in the nature of compensation, . . . whether you're a band 4, band 3, band 2." (J.A. 474).

Notably, the record also contains the Honeywell created document entitled "Our Pay Philosophy." (J.A. 626). The document states that employees in positions below band 5 may receive stock option grants separately from bands 5 and 6 through its broad-based stock-option program. Further, under the subheading "Why we use options," the document expressly provides:

> Our stock price is the ultimate indicator of the value of our company and its potential. The market rewards results, not just effort. Our long-term incentive ties your actions to achievement of our business strategy over time as evidenced by stock price performance. *With stock options, there are no entitlements, no guarantees and no rewards for maintaining the status quo. Stock options provide a highly leveraged pay opportunity*. As shareholder value increases, so will the value of your options.

(J.A. 627) (emphasis added). Under the subheading "Our Stock Option Philosophy," the same document goes on to state:

> Guidelines for stock options are determined each year based on a review of competitive-positioning and the value of an option at that point in time.

Your individual award level continues to be linked directly to the results of the Management Resource Review (MRR) process. Your award reflects your position as a key member of the leadership team and your potential to be a significant contributor going forward. Think about stock options as a look ahead: Top performers with the most significant potential receive the greatest number of options.

*Id.*

The Committee granted Dr. Varghese stock options on four separate occasions. Specifically, the Committee granted Dr. Varghese stock options on July 31, 1992, July 30, 1993, July 29, 1994, and July 19, 1996.

The record facilely supports the reasonable inference that Dr. Varghese performed his job duties at Honeywell with distinction in the one year periods immediately preceding each of these stock option grants. For example, the record contains two glowing performance reviews for two of the option grant periods. The first is for the period beginning July 1991 and ending July 1992. The second is for the period beginning August 1992 and ending October 1993. In both reviews, Honeywell rated Dr. Varghese's overall performance during the respective rating periods as "Outstanding." (J.A. 175, 181). According to the performance review forms, such a rating meant that "[m]ajor job responsibilities were exceeded in all areas. Established objectives that stretched employee performance were achieved or exceeded. Overall performance was clearly exceptional." (J.A. 172, 178).

To its credit, Honeywell makes no disparaging statements in this appeal regarding Dr. Varghese's job performance while at Honeywell. Similarly, Honeywell does not take issue with the statement in Dr. Varghese's appellate brief that his job performance was excellent during the years for which Honeywell granted him the stock options.[1]

---

[1] If the record below contains performance reviews for the other two option grant periods, the parties did not see fit to include them in the joint appendix for our consideration.

Based upon the series of stock option grants, at the time of his involuntary termination of employment in 1999, Dr. Varghese had the vested right to purchase 4,800 shares of Honeywell stock at prices established at the time of the respective grants. Soon after receiving notice of his termination, Dr. Varghese wrote several letters to Honeywell asking to exercise his stock options. Honeywell subsequently informed Dr. Varghese that his options had expired because it deemed his termination to have been voluntary. Honeywell does not challenge on appeal the jury's finding that it had misclassified Dr. Varghese's termination, and thus had impermissibly refused to allow him to exercise his fully vested stock options. Rather, Honeywell challenges Dr. Varghese's qualification for enhanced damages under the MWP&CL for its actions in this regard.

For his part, Dr. Varghese acknowledged at his pretrial deposition and at trial that, in contrast to a band 5 or 6 employee, as a band 4 employee, he had no guarantee that Honeywell would grant him stock options in any given year. Rather, he only had the potential for such a grant. Dr. Varghese also testified at trial that Honeywell never promised that it would actually grant him stock options as part of his compensation. However, it is undisputed from the record that, as a band 4 employee, he would be eligible for the discretionary grant of stock options.

## II.

With the preceding factual background and procedural history in mind, I turn now to analyze whether the right to exercise the stock options granted Dr. Varghese in accordance with the terms of the operative stock option plan constitutes "wages" under the MWP&CL.

Specifically, the MWP&CL provides: "Each employer shall pay an employee . . . all wages due for work that the employee performed before the termination of employment, on or before the day on which the employee would have been paid the wages if the employment had not been terminated." Md. Code, Labor and Employment, § 3-505. MWP&CL § 3-507.1 creates a private right of action to recover for violation of MWP&CL § 3-505:

> [I]f an employer fails to pay an employee in accordance with . . . § 3-505 of this subtitle, after 2 weeks have elapsed

from the date on which the employer is required to have paid the wages, the employee may bring an action against the employer to recover the unpaid wages. . . .

Md. Code, Labor and Employment, § 3-507.1(a). The enhanced penalty provision of this section provides:

If, in an action under subsection (a) of this section, a court finds that an employer withheld the wage of an employee in violation of this subtitle and not as a result of a bona fide dispute, the court may award the employee an amount not exceeding 3 times the wage, and reasonable counsel fees and other costs.

*Id.*

The MWP&CL defines "wage" broadly and specifically identifies a non-exclusive list of compensation categories as wages for purposes of the MWP&CL:

(1) "Wage" means all compensation that is due to an employee for employment.

(2) "Wage" includes:

(i) a bonus;

(ii) a commission;

(iii) a fringe benefit; or

(iv) any other remuneration promised for service.

Md. Code, Labor and Employment, § 3-501(c). In *Whiting-Turner Contracting Co. v. Fitzpatrick*, 783 A.2d 667 (Md. 2001), the Court of Appeals of Maryland made clear that MWP&CL § "501(c)(2)(iv) serves two functions: it makes clear both that the listed forms of remuneration are simply examples, by the use of the phrase 'any other remuneration,' and that the 'other remuneration' that may be included

in—in order to be considered—wages must have been 'promised for service.'" *Whiting-Turner*, 783 A.2d at 672.

Of course, the posture of this case on appeal requires that we view the evidence in the record in the light most favorable to Dr. Varghese and draw all reasonable inferences from that evidence in his favor. *Ocheltree v. Scollon Prod., Inc.*, 335 F.3d 325, 331 (4th Cir. 2003). Under this dictate, the record supports the reasonable inference that Honeywell granted Dr. Varghese the stock options at issue in significant part because he had performed his job in an exceptional manner in the immediately preceding years.[2] In other words, Dr. Varghese had performed his job at Honeywell during those years in a manner that was not required of him; in a manner which exceeded the status quo by a wide margin.

Based upon *Whiting-Turner*, 783 A.2d at 667, *Medex v. McCabe*, 811 A.2d 297 (Md. 2002), and Dr. Varghese's admission at trial that Honeywell never promised to grant him stock options, Honeywell argues that prior to the actual grants of the stock options at issue, such stock options and/or the right to exercise them did not qualify as "remuneration promised for [Dr. Varghese's] service." Md. Code, Labor & Employment, § 3-501(c)(2)(iv). However, once Honeywell actually granted Dr. Varghese the stock options with the concomitant promises that he could exercise them in accordance with the terms of the operative stock option plan, Dr. Varghese's *right to exercise* those options in accordance with the terms of the operative stock option plan constituted "remuneration promised for service," *id.*, and thus wages under the MWP&CL. Part II.B. of Judge Gregory's opinion, as concurred in by Judge Motz, overlooks the reality that the facts of this case, when properly viewed, fall squarely within the language of the enhanced damages provision of the MWP&CL.

The fact that Honeywell granted Dr. Varghese the stock options for service that he was not erstwhile required to perform is critical to the analysis, because the promised right to exercise the stock options is

---

[2]Even Part II.B. of Judge Gregory's opinion, as concurred in by Judge Motz, recognizes "that the grant of stock options in this matter was, in all likelihood, at least partially remuneration for Dr. Varghese's past performance." *Ante* at 11.

then not a mere gratuity, but "remuneration promised for service." Md. Code, Labor & Employment, § 3-501(c)(2)(iv). As the Maryland Court of Appeals declared in *Whiting-Turner*, "[o]nce a bonus, commission or fringe benefit has been promised as a part of the compensation for service, the employee would be entitled to its enforcement as wages." *Whiting-Turner*, 783 A.2d at 672.

Here, viewing the evidence in the record in the light most favorable to Dr. Varghese, which we are required to do, Dr. Varghese's right to exercise the stock options granted him by Honeywell was promised by Honeywell as part of the compensation for Dr. Varghese's exceptional service, and therefore, constituted wages under the MWP&CL. Accordingly, I would hold that the district court did not err in refusing to grant Honeywell's motion for judgment as a matter of law with respect Dr. Varghese's claim for enhanced damages under the MWP&CL.

One final and crucial point: The fact that the respective stock option grants post-dated Dr. Varghese's beyond-the-status-quo service during the years immediately preceding those grants is neither foreclosed by the language of the MWP&CL nor Maryland case law. Viewing the evidence in the light most favorable to Dr. Varghese, one can draw the reasonable inference that prior to the time of even the first stock option grant to Dr. Varghese, Honeywell had *promised*, *as part of Dr. Varghese's total compensation*, that once it granted him stock options based upon his beyond-the-status quo service to the company, he could exercise those options in accordance with the terms of the operative stock option plan. The key fallacy in Judge Gregory's analysis in Part II.B., as concurred in by Judge Motz, is his unwillingness to draw this reasonable inference, which by precedent he is bound to do. Of course the opposite inference is the one that is unreasonable—Honeywell set up a detailed employee stock option plan, placed great emphasis on the plan's purpose to encourage the highest level of performance by its employees, but did not intend the promise that granted stock options could be exercised in accordance with the operative stock option plan to constitute part of the employee's total compensation for employment. Plainly stated, Judge Gregory and Judge Motz's view of the evidence on this point fails to afford Dr. Varghese the benefit of viewing the evidence in the record

in the light most favorable to him and drawing all reasonable inferences therefrom in his favor.

In sum, I would affirm the judgment below *in toto*. Accordingly, I concur in Part III of Judge Gregory's opinion, but dissent from Part II.B., as concurred in by Judge Motz.