816 A.2d 844

Jerry W. EID, et ux.

v.

Christopher J. DUKE, et al.

No. 140, Sept. Term, 2000.

Court of Appeals of Maryland.

Feb. 13, 2003.

Edward J. Lilly (Thomas C. Summers of Law Offices of Peter G. Angelos, on brief), Baltimore, for Petitioners.

M. Natalie McSherry (Whiteford, Taylor & Preston, LLP, on brief), Baltimore, for Respondents.

Argued before ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and ROBERT L. KARWACKI (Retired, specially assigned), JJ.

ELDRIDGE, Judge.

Jerry Eid, Sr., an employee of Bell Atlantic Corporation (now called Verizon Corporation), along with his wife, filed this tort action against the administrator of his employer's disability benefits plan and the administrator's medical consultant. The issue before us is whether the Eids' tort action is preempted by the federal Employee Retirement Income Security Act of 1974 (ERISA), 88 Stat. 832, 29 U.S.C. § 1001 *et seq.*

I.

Eid, an auto mechanic working for Bell Atlantic, was covered by Bell Atlantic's Sickness, Accident and Disability Benefit Plan (hereafter referred to as "the Plan"), which provided short term disability benefits to employees who were "physically disabled and unable to work because of a work related injury." The Bell Atlantic Plan is an ERISA covered employee benefit plan under the definition in 29 U.S.C. § 1002(3). Bell Atlantic retained Core, Inc., as the Claims and Appeals Fiduciary to administer the Plan. Core was authorized to make findings of fact and to resolve all issues presented by claims and appeals under the Plan.

In August 1996, Eid was diagnosed as having a bone spur on his right heel. His podiatrist, Dr. Victor Tritto, scheduled Eid for surgery on August 29, 1996, to have the spur excised. Mrs. Eid, prior to August 29, notified a Core representative that Eid would be disabled following the surgery and would rely on Plan benefits during his convalescence. On the day of the surgery, Dr. Tritto informed a Core representative that Eid would be absent from work for a period of three to six weeks, as the surgery was complex and rare. Dr. Tritto also informed the Core representative that he would re-evaluate Eid's capacity for light work duties in three weeks.

Approximately two weeks after the surgery, a Core representative informed Mrs. Eid that Mr. Eid's benefits were scheduled to be terminated on September 20, 1996, and that he was expected to return to work the following day, September 21st. When Mrs. Eid informed Dr. Tritto about this development, Dr. Tritto contacted a Core representative, who was a nurse, to express his opinion that the termination date was inappropriately early. Dr. Tritto also provided medical information about the complexity of Eid's surgery and informed the Core nurse that Eid would not be able to return to work for an additional two to four weeks, as he was presently on crutches and could not place any weight on the injured foot. The Core nurse told Dr. Tritto that the file would be forward-

ed for physician staff review in accordance with internal review procedures under the Plan.

Eid's file was forwarded to Dr. Christopher J. Duke for a review of the benefit determination. Dr. Duke had been hired by Core to perform such reviews. The physician review, under the terms of the Plan, is based on the record maintained by Core and any information that the treating physician provides to the reviewing physician. Dr. Duke did not conduct a medical examination of Eid, or review Eid's medical or x-ray records during the review process. Dr. Duke never met or spoke personally with Eid at any time, before or after the termination of Eid's benefits, and he conducted the review based on Eid's file and a conversation with Dr. Tritto.

Dr. Duke contacted Dr. Tritto by telephone to discuss Eid's case. Dr. Tritto, in an affidavit, stated that he told Dr. Duke that the surgery was successful but that Eid was not yet physically able to return to work. According to Dr. Duke's deposition, however, Dr. Tritto told Dr. Duke that Eid could walk on crutches but could not put any weight on the foot and was unable to get to work because he could not drive. Dr. Duke, according to his deposition, then informed Dr. Tritto that, because Eid was able to walk with crutches, he was no longer eligible for disability benefits because he was no longer wholly disabled under the Plan guidelines.[1] Dr. Duke advised Dr. Tritto of his opinion that Eid was capable of returning to work in a sedentary capacity, with accommodations that took into account the fact that he could not bear any weight on his right foot. In accordance with Dr. Duke's determination, Core scheduled Eid's benefits to terminate on September 21. Because of certain administrative reasons, this termination date was postponed to October 7.

---

1. Under these guidelines, "disability is considered to be inability to do any job (total disability)." The defendants' position was that if an employee was capable of performing any tasks at the workplace, even if he were incapable of performing his customary tasks, the employee was no longer considered to be disabled for the purposes of receiving disability benefits under the Plan. Ability to get to work, according to the defendants, was not a criterion for disability.

Eid returned to work on October 8, 1996, following the termination of his disability benefits under the Plan. He stated in his deposition that he returned to work on that date because he was afraid that he would be discharged if he did not do so. Eid based this belief on the response he received from a Core nurse to his inquiry about the consequences of his not reporting to work on October 8. According to Eid, the nurse informed Eid that Bell Atlantic could take disciplinary action against him if he did not return to work that day. In his deposition, Eid also said that he contacted a union representative who told him that, under the circumstances, Bell Atlantic would have the authority to discharge him.

Eid worked half days on October 8 and 9, performing sedentary duties. He experienced considerable pain and left early each day, using vacation time. On October 10, while at work, he once again experienced considerable pain. As Eid walked to the restroom before leaving on October 10, one of his crutches caught on a metal plate in the floor. Eid fell on his injured foot and tore his Achilles tendon. He has since needed several surgeries to repair the damage and remains in pain. He has been unable to resume his normal employment as an auto mechanic with Bell Atlantic.

## II.

Jerry Eid and his wife filed this medical malpractice tort action in the Circuit Court for Baltimore City against Dr. Duke and Core. In their complaint, as amended, the Eids alleged in count one that Dr. Duke and Core negligently caused Jerry Eid to return to work before he was physically fit to do so by cutting off his disability benefits under the Plan. Dr. Duke's recommendation that Eid was fit to return to work was the basis of the negligence alleged in count one. In count two, the plaintiffs alleged that Dr. Duke, "as an agent and/or employee" of Core, "fraudulently concealed and/or misrepresented" Mr. Eid's condition and disability as well as the recommendation of his treating physician. This second count was based on the notes that Dr. Duke made in Eid's file following Dr. Duke's discussion with Dr. Tritto. In a third

count, Eid and Mrs. Eid sought damages for loss of consortium.

The defendants filed a motion to dismiss the complaint, arguing that the claims were related to a benefit determination under an ERISA covered plan and thus were preempted under ERISA. The trial court denied the motion. After discovery, Dr. Duke and Core filed two motions for summary judgment. The first motion for summary judgment asserted that the tort claims were preempted by ERISA. The second motion for summary judgment asserted that there was no patient-physician relationship between Eid and Dr. Duke and thus no basis for a tort action under Maryland law. The trial court granted the defendants' motion for summary judgment based on ERISA preemption, without expressly ruling on the other motion for summary judgment.

The Eids appealed, and the Court of Special Appeals affirmed the trial court's judgment in an unreported opinion authored by Judge Charles E. Moylan, Jr. The Court of Special Appeals' opinion was based on the broad reach of federal preemption under ERISA. *See California Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 117 S.Ct. 832, 136 L.Ed.2d 791 (1997); *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995). In holding that the plaintiffs' state law tort claims were preempted, the Court of Special Appeals distinguished the facts of the instant case from other authority cited by the plaintiffs where the courts had found that a physician-patient relationship existed to sustain a medical malpractice claim that was not preempted by ERISA. In particular, the intermediate appellate court distinguished this case from *Crum v. Health Alliance–Midwest Inc.*, 47 F.Supp.2d 1013 (C.D.Ill. 1999). In *Crum*, the insured received what turned out to be improper treatment suggestions, to alleviate symptoms, from a nurse employed by the health insurer. The insured subsequently died because of delay in seeking further medical care. The delay was based on the nurse's advice, and the federal court held that, under such circumstances, the wrongful death

claim was not preempted by ERISA. Nevertheless, as the Court of Special Appeals pointed out in the instant case, *Crum* is distinguishable because the insured in *Crum* had sought and received medical advice from a nurse, a medical provider under the ERISA plan. On the other hand, as the Court of Special Appeals emphasized, Dr. Duke never met or spoke with Eid, and made "his recommendation as to benefit eligibility ... solely as a result of a paper file ... and a one-time consultation with [Eid's] treating physician."

The Eids filed in this Court a petition for a writ of certiorari, raising two issues. First, they challenged the trial court's and the Court of Special Appeals' holding that the action was preempted by ERISA. Second, the Eids asserted that the Court of Special Appeals erred by relying on the lack of a patient-physician relationship when the trial court did not grant summary judgment on that ground. We granted the Eids' petition for a writ of certiorari, *Eid v. Duke*, 363 Md. 205, 768 A.2d 54 (2001).

### III.

As a preliminary matter, we shall first consider the plaintiffs' argument that the Court of Special Appeals erred in reaching the issue of whether a patient-physician relationship existed between Eid and Dr. Duke. The Eids correctly assert that it is an "established rule of Maryland procedure that, '[i]n appeals from grants of summary judgment, Maryland appellate courts, as a general rule, will consider only the grounds upon which the [trial] court relied in granting summary judgment.'" *Lovelace v. Anderson*, 366 Md. 690, 695, 785 A.2d 726, 729 (2001), quoting *PaineWebber v. East*, 363 Md. 408, 422, 768 A.2d 1029,1036 (2001). But this principle is applicable only when there are two or more separate and distinct grounds for the grant of summary judgment, and the trial court relies on one, but not another, in granting summary judgment.

The two motions for summary judgment in the case at bar were not based on separate and distinct grounds. Under

circumstances like those in the present case, the issue of ERISA preemption is inextricably intertwined with the existence of a patient-physician relationship and whether the plaintiffs set forth a viable state law medical malpractice cause of action.  As the Court of Special Appeals recognized, and as we discuss in Part IV below, these issues are interrelated under the Supreme Court cases interpreting and applying the ERISA statute.  In fact, the plaintiffs indirectly acknowledge that the issues are interrelated, as they repeatedly characterize their action as a medical malpractice action and rely on cases holding that ERISA does not preempt traditional state law medical malpractice actions.  (Petitioners' brief at 16–17, 21–25, 27).

Consequently, because of the interrelationship of the issues, the Court of Special Appeals did not uphold a grant of summary judgment on a ground which was separate and distinct from the ground relied on by the trial court.

### IV.

As previously stated, the issue before us is whether the trial court correctly granted summary judgment in favor of the defendants, Dr. Duke and Core, on the ground that the tort action was preempted by ERISA.  We shall hold that the Eids' asserted state law tort action "relates to" a benefits determination under an ERISA covered plan and is, therefore, preempted under 29 U.S.C. 1144(a).

Congress enacted ERISA in recognition of the rapid and substantial "growth in size, scope, and numbers of employee benefit plans."  29 U.S.C. § 1001(a).  ERISA had two broad goals:  safeguarding the interests of the plan participants and encouraging employers to offer such plans.  ERISA sought to protect the interests of participants in employee benefit plans "by providing for appropriate remedies, sanctions, and ready access to Federal courts."  29 U.S.C. § 1001(b).  To encourage employers to provide benefit plans by simplifying administration, Congress included a broad preemption provision in the statute, by which the federal law was

to "supersede any and all State laws insofar as they may now or hereafter *relate to* any employee benefit plan." 29 U.S.C. § 1144(a) (emphasis added). State laws, in the context of ERISA, include "all laws, decisions, rules, regulations, or other State action having the effect of law, of any State." 29 U.S.C. § 1144(c). This broad preemption provision was intended to eliminate possibly conflicting or inconsistent state and local regulation of employee benefit plans. For prior discussions by this Court of ERISA and its preemption of state law, *see Connecticut General v. Insurance Commissioner*, 371 Md. 455, 810 A.2d 425 (2002) (involving the exception to the ERISA preemption provision for state laws regulating insurance); *Insurance Commissioner v. Metropolitan Life Ins. Co.*, 296 Md. 334, 463 A.2d 793 (1983) (same).

Having preempted state law, ERISA provides specific remedies that are available in federal courts. ERISA has an "overpowering federal policy in [its] civil enforcement provisions, 29 U.S.C. § 1132(a), authorizing civil actions for ... specific types of relief." *Rush Prudential HMO Inc. v. Moran*, 536 U.S. 355, ——, 122 S.Ct. 2151, 2164, 153 L.Ed.2d 375, 395 (2002) (footnote omitted). These provisions amount to an "interlocking, interrelated, and interdependent remedial scheme." *Massachusetts Mutual Life Ins. Co. v. Russell*, 473 U.S. 134, 146, 105 S.Ct. 3085, 3092, 87 L.Ed.2d 96, 106 (1985). The United States Supreme Court has "been especially 'reluctant to tamper with [the] enforcement scheme' embodied in the statute by extending remedies not specifically authorized by its text." *Great–West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 209, 122 S.Ct. 708, 712, 151 L.Ed.2d 635, 642 (2002), quoting *Massachusetts Mutual Life Ins. Co. v. Russell, supra*, 473 U.S. at 147, 105 S.Ct. at 3093, 87 L.Ed.2d at 106. State laws that provide alternative remedies are preempted under ERISA, as frustrating the purpose of ERISA of providing "a uniform judicial regime of categories of relief." *Rush Prudential HMO Inc. v. Moran, supra*, 536 U.S. at ——, 122 S.Ct at 2169, 153 L.Ed.2d at 401. *See, e.g., Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990) (holding that Texas's tort of wrongful discharge

conflicted with ERISA enforcement by converting an equitable remedy available in federal court to a legal one available in a state tribunal); *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987) (holding that ERISA displaced state tort and contract claims based on allegedly improper denial of benefits under an ERISA plan).

In determining whether a claim under state law is preempted by ERISA, a court must consider whether the claim "relates to" an ERISA covered plan, such that granting relief based on the state law would provide a remedy not permitted by ERISA. 29 U.S.C. § 1144(a). For purposes of preemption, a claim relates to a covered employee benefit plan " 'if it has a connection with or reference to such a plan.' " *District of Columbia v. Greater Washington Board of Trade*, 506 U.S. 125, 129, 113 S.Ct. 580, 583, 121 L.Ed.2d 513, 520 (1992), quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 97, 103 S.Ct. 2890, 2900, 77 L.Ed.2d 490, 501 (1983). The United States Supreme Court has eschewed "uncritical literalism" when construing the ERISA term "relates to," and has "look[ed] instead to the objectives of the ERISA statute as a guide" to the scope of preemption that Congress intended. *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., supra*, 514 U.S. at 656, 115 S.Ct. at 1677, 131 L.Ed.2d at 705.[2]

More recently, the Supreme Court looked to congressional intent in stating that ERISA did not preempt state medical

---

**2.** In *Travelers*, the Supreme Court held that a New York statute regulating charges for in-patient hospital care, which imposed a surcharge on patients served by commercial insurers and health maintenance organizations, but which did not impose a similar surcharge on patients served by a Blue Cross/ Blue Shield Plan, was not preempted. The Supreme Court held that the New York statute was not preempted by ERISA because it had at most "an indirect economic influence" which did not "bind plan administrators to any particular choice" and therefore did not "function as a regulation of an ERISA plan." *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 659, 115 S.Ct. 1671, 1679, 131 L.Ed.2d 695, 707 (1995). Thus, a state law that has such an indirect economic effect on an ERISA plan is not "relate[d] to" the plan for the purpose of ERISA preemption.

malpractice laws. *See Pegram v. Herdrich,* 530 U.S. 211, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000) (no preemption of state law under ERISA "without clear manifestation of congressional purpose"). *Pegram v. Herdrich* drew a sharp distinction between traditional medical malpractice actions and ERISA breach of fiduciary duty actions. The plaintiffs' suit in *Pegram,* which had been removed to a federal district court, involved both state medical malpractice claims and federal ERISA breach of fiduciary duty claims against a physician and an HMO. The plaintiffs recovered a judgment under the medical malpractice counts, and this judgment was not challenged in the Supreme Court. The issue in the Supreme Court was whether the plaintiffs had also set forth a breach of fiduciary duty claim under ERISA.[3]

The Supreme Court in *Pegram* recognized that the fiduciary duty under ERISA, while it draws on trust law, is not exactly the same as the fiduciary duty imposed under traditional trust law. In the ERISA context, a physician, while acting as a fiduciary for an employee benefit plan, can also make medical treatment decisions that could be the basis of a medical malpractice claim. In its analysis, the Supreme Court distinguished between three types of decisions: pure eligibility decisions; medical treatment decisions; and mixed treatment and eligibility decisions. A pure eligibility decision "turn[s] on the plan's coverage of a particular condition," while a treatment decision is "about diagnosing and treating a patient's condition." *Pegram,* 530 U.S. at 228, 120 S.Ct. at 2154, 147 L.Ed.2d at 180. Mixed decisions are "eligibility decisions

---

**3.** Under ERISA "a person is a fiduciary with respect to a plan to the extent ... he exercises discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A). The statute provides that the term "fiduciary" includes, but is not limited to, "any administrator, officer, trustee ... or employee of such employee benefit plan." 29 U.S.C. § 1002(14)(A). In *Pegram v. Herdrich,* Pegram, the treating physician, decided that a diagnostic test on Herdrich could be delayed several days until it could be conducted at a facility staffed by the health maintenance organization (HMO) rather than authorizing the test immediately at a different facility. The delay resulted in significant harm to Herdrich's health.

[which] cannot be untangled from physicians' judgments about reasonable medical treatment." 530 U.S. at 229, 120 S.Ct. at 2154, 147 L.Ed.2d at 181. The Supreme Court held that treatment and mixed treatment and eligibility decisions were not fiduciary decisions for the purposes of ERISA, and did not give rise to a federal court ERISA action, even though the physician was acting in some degree as a fiduciary. The Court pointed out that, if mixed decisions could be the basis for federal breach of fiduciary duty suits under ERISA, then "federal fiduciary law applying a malpractice standard would seem to be a prescription for preemption of state malpractice law, since the new ERISA cause of action would cover the subject of a state-law malpractice claim." 530 U.S. at 236, 120 S.Ct. at 2158, 147 L.Ed.2d at 186. Accordingly, state law medical malpractice tort actions, based on such mixed decisions, are not preempted by the federal statute, whereas pure eligibility decisions are preempted.

Thus, in a context like the present case, involving the alleged negligence of a health care professional acting under an ERISA plan, the issue of preemption is inextricably bound up with the availability of a traditional medical malpractice claim under state law. If the nature of the action constitutes a traditional state law medical malpractice action, it is probably not preempted by ERISA. If, however, a physician's decision would not give rise to a traditional medical malpractice action, but is entirely an administrative decision concerning eligibility under or coverage of an ERISA plan, it is preempted. *See Roark v. Humana, Inc.*, 307 F.3d 298 (5th Cir.2002) (relying on *Pegram v. Herdrich, supra,* in holding that state law claims based on mixed treatment and eligibility decisions by HMO physicians were not preempted by ERISA); *Pryzbowski v. U.S. Healthcare, Inc.*, 245 F.3d 266 (3d Cir. 2001) (holding that claims of negligence, bad faith and breach of contract against a health insurer were based on an administrative function of the insurer and were therefore preempted under ERISA, but claims against the physicians were not preempted because they were based on medical treatment

decisions, and the physicians disclaimed "any administrative authority or responsibility with respect to the plan").

Therefore, under the circumstances of this case, the issue of ERISA preemption cannot be determined independently from the medical malpractice claim.

Ordinarily, under Maryland law, "except in those unusual circumstances when a doctor acts gratuitously or in an emergency situation, recovery for malpractice 'is allowed only where there is a relationship of doctor and patient as a result of a contract, express or implied, that the doctor will treat the patient with proper professional skill and the patient will pay for such treatment, and there has been a breach of professional duty to the patient.'" *Dingle v. Belin*, 358 Md. 354, 367, 749 A.2d 157, 164 (2000), quoting *Hoover v. Williamson*, 236 Md. 250, 253, 203 A.2d 861, 863 (1964). Gratuitous actions for the benefit of the employee by the employer's physician can create a relationship sufficient to form the basis of a medical malpractice claim, as was the case in *Hoover v. Williamson*, *supra*, where the physician induced reliance by providing the employee with a wrongful estimate of his health, and concealed from the employee the treatment recommendations of a specialist. Generally, however, "there is not a doctor-patient relationship between . . . a prospective or actual insured and the physician who examines him for the insurance company, . . . or [an] employee and the doctor who examines him for the employer." *Hoover v. Williamson*, *supra*, 236 Md. at 253, 203 A.2d at 863. *See also Sterling v. Johns Hopkins Hosp.*, 145 Md.App. 161, 170, 802 A.2d 440, 445, *cert. denied*, 371 Md. 264, 808 A.2d 808 (2002); James L. Rigelhaupt, Jr., Annotation: *What Constitutes Physician–Patient Relationship for Malpractice Purposes*, 17 A.L.R.4th 132 (1982), and cases there collected; J.P. Ludington, Annotation: *Physician's Duties and Liabilities to Person Examined Pursuant to Physician's Contract with such Person's Prospective or Actual Employer or Insurer*, 10 A.L.R.3d 1071 (1966).

During the time of the disputed conduct, Dr. Duke was an agent of Core, Inc., acting on behalf of Bell Atlantic, Mr. Eid's employer. There was no contractual relationship between Dr.

Duke and Eid for Dr. Duke's professional services for Eid's benefit. Dr. Duke did not undertake any gratuitous duty toward Eid. He made no treatment recommendation regarding Eid, either directly or to Eid's treating physician. He did not examine Eid or his medical records, beyond the records maintained by Core for the purposes of a disability benefit determination under the Plan. Dr. Duke's role was limited to determining whether Eid met the criteria for disability benefits established by the Plan. In his opinion for the Court of Special Appeals, Judge Moylan quoted the trial judge's comment as follows:

" 'It seems odd to say that someone whose job is essentially to make sure that Bell Atlantic does not pay too much for health care costs and as a part of that hire a physician to see whether someone is entitled to continuing benefits, that the performance of that person's job establishes a patient-physician relationship with the person he has essentially been hired to determine whether is malingering. That seems odd to say that is a patient-physician relationship.' "

To reiterate, Dr. Duke's function was solely to decide whether Jerry Eid was disabled within the meaning of the Plan. Dr. Duke's determination was a pure eligibility decision. He was acting entirely within his capacity as a fiduciary under the Plan. If he may have misinterpreted the Plan, or erroneously applied the Plan to Eid's condition, or misrepresented Eid's condition for purposes of coverage under the Plan, Eid's remedy, if any, was a federal court ERISA breach of fiduciary duty action. *See Varity Corp. v. Howe*, 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996) (ERISA plan administrator's misrepresentations to plan beneficiaries concerning their benefits gave rise to a federal court breach of fiduciary duty action under ERISA). The Circuit Court and the Court of Special Appeals correctly held that the asserted state law actions were preempted.[1]

*JUDGMENT AFFIRMED, WITH COSTS.*

---

**4.** The plaintiffs' amended complaint in the Circuit Court, in addition to alleging negligence, alternatively asserted that Dr. Duke acted "fraudu-

lently." The plaintiffs have not repeated this assertion in their briefs in this Court. Instead, they have argued that "[t]his is simply a suit for damages for injuries caused by CORE and Dr. Duke in negligently forcing Mr. Eid to return to work when that action was contrary to the informed medical judgment of his treating physician and was a violation of the medical standard of care" (Petitioners' brief at 27). Moreover, the plaintiffs have set forth no facts sufficient to allege a deceit action under Maryland law. *See VF Corp. v. Wrexham Aviation,* 350 Md. 693, 703, 715 A.2d 188, 192–193 (1998). Finally, a plan administrator's acting "fraudulently" does not take the case outside the scope of an ERISA breach of fiduciary duty action and ERISA preemption of state law. *Varity Corp. v. Howe,* 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996).