995 A.2d 960

CATALYST HEALTH SOLUTIONS,
INC., f/k/a HealthExtras, Inc.

v.

Martin A. MAGILL.

No. 80 Sept.Term, 2009.

Court of Appeals of Maryland.

June 2, 2010.

458

Joseph M. Mott, Rockville, MD (Christopher G. Mackaronis of Brickfield, Burchette, Ritts & Stone, P.C., Washington, DC), on brief for Appellant.

Brief of Amici Curiae of Chamber of Commerce of the United States of America, the Maryland Chamber of Commerce, Discovery Communications, Inc., Lockheed Martin Corp., and Marriott Intern., Inc., in support of appellant:

Robin S. Conrad, Esquire, Shane B. Kawka, Esquire, Nat. Chamber Litigation Center, Inc., Washington, DC; Harold P. Coxson, Esquire, Brian D. Black, Esquire, John B. Flood, Esquire, Ogletree, Deakins, Nash, Smoak & Stewart, PC, Washington, DC.

Jerry R. Goldstein (Bulman, Dunie, Burke & Feld, Chtd., Bethesda, MD), on brief for Appellee.

ARGUED BEFORE BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

BATTAGLIA, Judge.

In this case we must determine whether an employee's

conditionally granted unvested incentive stock options [1] are "wages" under the Maryland Wage Payment and Collection Law (Wage Act or Act), Sections 3–501 to 3–509 of the Labor and Employment Article, Maryland Code (1991, 1999 Repl. Vol.).[2]

This appeal arises from a judgment in the Circuit Court for Montgomery County by which Martin A. Magill, appellee, became entitled to damages based upon a determination of the value of 60,000 conditionally granted unvested incentive stock options, awarded under grant agreements by his former employer, Catalyst Health Solutions, Inc. (Catalyst), formerly known as HealthExtras,[3] appellant. Mr. Magill had agreed to remain employed for a specific period of time for the options to vest and become exercisable, but he did not meet that condition before leaving his employment with Catalyst. Catalyst appealed the decision of the Circuit Court, and we granted certiorari, prior to any proceedings in the Court of Special Appeals, to answer the following questions:

1. Did the Circuit Court err in holding that unvested stock options constitute "wages" "promised for service" under the [Maryland Wage Payment and Collection Law] when they were conditionally granted pursuant to an unambiguous

---

1. A "stock option" is "[a]n option that allows a corporate employee to buy shares of corporate stock at a fixed price or within a fixed period. Such an option is usu[ally] granted as a form of compensation and can qualify for special tax treatment under the Internal Revenue Code.— Also termed *employee stock option; incentive stock option (ISO)." Black's Law Dictionary* 1554 (9th ed. 2009).

2. All statutory references are to the Maryland Wage Payment and Collection Law, Sections 3–501 to 3–509 of the Labor and Employment Article, Maryland Code (1991, 1999 Repl.Vol.), the version in effect at the time Martin A. Magill left his employment with Catalyst, unless otherwise provided.

3. Catalyst Health Solutions, Inc., conducted business under the name HealthExtras, Inc., during the majority of the time that matters were pending in this appeal. For clarity, we use the name "Catalyst" to refer to the appellant but use "HealthExtras" when quoting from agreements and exhibits using that name.

written agreement and the service conditions were not fulfilled?

2. Did the Circuit Court err by rewriting the terms of the parties' grant agreements in formulating a damages award?[4]

We shall hold that the conditionally granted unvested incentive stock options were not wages under the Wage Act, because Mr. Magill did not fulfill the continued employment service condition, as set forth in the grant agreements to which he had assented.

## FACTS

Martin A. Magill accepted the position of Vice President of Sales for Catalyst Health Solutions, Inc., in February of 2004. The terms of his compensation package included, among other things,[5] a yearly salary and the right to acquire stock options pursuant to the company's plan. The terms of Mr. Magill's recompense were set forth in a letter dated February 11, 2004, from Catalyst's Chief Executive Officer, David T. Blair, which provided in pertinent part:

3. **Compensation**

a. **Salary:** You shall receive an initial base salary of $135,000 per year and a monthly car allowance of $800.

b. **Stock Options:** You will be granted 40,000 options to acquire HealthExtras common stock. The terms of the options are described in the HealthExtras Stock Option Plan.

Mr. Magill executed an "Incentive Stock Option Award Agreement," dated March 1, 2004, which specified that the award of options was for 40,000 shares of Catalyst's common stock[6]

---

4. Because we conclude that the unvested stock options were not wages under the Wage Act, we need not address the damages issue.

5. Mr. Magill's compensation package also included commissions, an annual bonus, relocation assistance, business expenses, and fringe benefits, although these items are not relevant to this appeal.

6. In each of Mr. Magill's three Grant Agreements, he was given the option to purchase shares of Catalyst's "common stock." "Common

with an exercise price of $10.47 per share, and provided a vesting schedule setting forth the continued service condition of the grant:

**Vesting Schedule:**

Subject to the limitations of this Award Agreement, the Incentive Stock Option Award shall vest or become exercisable in installments according to the following schedule:

(a) 25% of this Option Award shall vest 12 months after the Date of Grant ("Initial Vesting Date").

(b) 75% of this Option Award shall vest in three (3) equal annual installments beginning on the first anniversary of the Initial Vesting Date.

Except as provided below, an installment shall not become exercisable on the otherwise applicable vesting date if the Optionee terminates employment or service prior to such vesting date.

Once vesting had been met, the Grant Agreement provided that "[t]he Exercise Price may be paid in cash or Common Stock having a Fair Market Value on the exercise date equal to the total Exercise Price."

The Grant Agreement stated that it was subject to the terms and conditions of the governing "1999 Stock Option Plan," which was adopted by a committee of Catalyst's Board of Directors and approved by its shareholders. The 1999 Stock Option Plan stated that its purpose was to provide incentives to its employees:

HealthExtras, Inc., a Delaware corporation, intends for the HealthExtras, Inc. 1999 Stock Option Plan (the "Plan") to provide additional incentive to certain valued and trusted officers, employees, and other individuals ... by encouraging them to acquire shares of common stock of the Company (the "Stock") through options to purchase Stock granted

stock" is "[a] class of stock entitling the holder to vote on corporate matters, to receive dividends after other claims and dividends have been paid (esp[ecially] to preferred shareholders), and to share in assets upon liquidation." *Black's Law Dictionary* 1552 (9th ed. 2009).

pursuant to the Plan ("Options"), thereby increasing each individual's proprietary interest in the business of the Company and providing them with an increased personal interest in the continued success and progress of the Company, the result of which will promote both the interests of the Company and its shareholders.

The 1999 Stock Option Plan echoed the terms of the Grant Agreement by noting that upon termination of employment or service, only options that were immediately exercisable or vested at the date of termination could be exercised, and only within three months following the date of termination.

After several weeks on the job, Mr. Magill's compensation package was revised to provide a $200,000 loan to Mr. Magill to facilitate his relocation, as well as an additional grant of 35,000 incentive stock options, subject to the company's stock option plan. These changes were memorialized in a letter dated April 16, 2004, from Mr. Blair, which stated in pertinent part:

> This letter shall confirm our discussion in which we agreed to review your relocation assistance package and employee stock option incentives after 45 days of employment.
>
> 1. *Relocation Assistance.* To facilitate your relocation to the Washington D.C. area, HealthExtras shall provide you a loan in the amount of $200,000. . . .
> 2. *Stock Option Incentives.* You shall receive an additional 35,000 stock options to purchase HealthExtras common stock. . . .

In conjunction with this letter, the parties executed a second "Incentive Stock Option Award Agreement" under the same terms as the first, and subject to the same "1999 Stock Option Incentive Plan," except for the grant date of April 16, 2004, the exercise price of $11.03, and the number of shares, 35,000.

Approximately five months later, Mr. Blair confirmed in a letter to Mr. Magill that Mr. Magill's terms of employment again were being revised to include a salary increase, a larger loan for relocation assistance, and an opportunity to receive additional stock options, referred to as a "Stretch Goal,"

granting 40,000 stock options, should the company reach its sales objectives. This letter provided in pertinent part:

3. *Stretch Goal.* Should HealthExtras implement 200,000 new fully funded PBM [Pharmacy Benefit Management] lives from August 1, 2004 through January 1, 2005 you shall be granted 40,000 stock options to purchase HealthExtras common stock. Should HealthExtras implement 400,000 new fully funded PBM lives from August 1, 2004 through April 1, 2005 you shall be granted an additional 40,000 stock options. The terms of the stock options are described in the HealthExtras 2002 Equity Incentive Plan [7] and the exercise price of such options shall be the closing price of HealthExtras stock on the day in which HealthExtras receives confirmation that such Stretch Goal has been achieved.

Shortly thereafter, Mr. Blair confirmed in a memorandum that Mr. Magill had reached his initial stretch goal and would "be granted 40,000 stock options to purchase HealthExtras stock." On the same day, Mr. Magill executed a third "Stock Option Award Agreement," which was virtually identical to the previous two agreements, except for the grant date of October 26, 2004, the exercise price of $13.30, and the number of shares, 40,000. It provided that Mr. Magill was granted an option to purchase 40,000 shares of HealthExtras, Inc. common stock, subject to the terms and conditions of the award agreement and the 2003 Equity Incentive Plan.

■ Approximately one year later, Mr. Magill agreed to revise the vesting schedule of his 115,000 stock options so that he would be "eligible to exercise [his] HealthExtras stock options and pay-off [his] loan due to HealthExtras." At the time of the agreement, Mr. Magill had not exercised the

---

7. Catalyst never identified a "2002 Equity Incentive Plan," and the parties agree that the reference was to the "2003 Equity Incentive Plan," which was a revised version of the "1999 Stock Option Plan." The 2003 Equity Incentive Plan contains no material changes from the previous plan, and is referred to in the October 26, 2004, "Stock Option Award Agreement."

28,750 stock options, which had vested. The agreement was memorialized in a letter signed by Mr. Magill on November 14, 2005, and provided that Catalyst would accelerate an additional 26,250 options that Mr. Magill would exercise to repay the loan:

1. Through HealthExtras equity incentive plans you have been granted 115,000 options ("Options") to acquire HealthExtras stock.

2. HealthExtras shall accelerate the vesting of your Options prior to November 15, 2005.

3. You shall exercise 55,000 Options on or before December 28, 2005. The proceeds from the exercise and sale of such Options shall be used to pay-off your loan to HealthExtras (current balance is approximately $266,000). HealthExtras will withhold applicable State and Federal taxes. All remaining proceeds shall promptly be forwarded to you.

After exercising 55,000 stock options, some at the price of $10.47 and some at the price of $11.03, Mr. Magill paid the outstanding balance of $266,000 on his relocation loan, netted approximately $100,000 in proceeds after tax withholding, and retained 60,000 stock options under a new vesting schedule delineated in the letter agreement, the first to occur April 16, 2006.[8]

In February of 2006, Mr. Magill accepted employment with a competitor of Catalyst and tendered his resignation, but continued to work at Catalyst while engaging in severance negotiations. After several attempts failed, Catalyst provided Mr. Magill with an "Employment Separation and Release Agreement," terminating his employment as of April 5, 2006, eleven days before 8,750 stock options were scheduled to vest.

---

8. Mr. Magill argued in his brief and at oral argument that Catalyst incorrectly exercised and sold different options than those specified in the November 2005 letter agreement, and that this error demonstrates that Catalyst accelerated the vesting of all of Mr. Magill's 115,000 options. This issue, though, was not preserved for review, because it was not included in the certiorari questions, and we have not addressed it.

Approximately two weeks after his termination, Mr. Magill attempted to exercise his 60,000 unvested stock options to no avail, because Catalyst had placed a block on his brokerage account.

## PROCEDURAL HISTORY

A few weeks after Mr. Magill's termination, Catalyst filed a Complaint for Declaratory Judgment and Damages in the Circuit Court for Montgomery County to request a determination "as to whether Magill has any claim for alleged unpaid commissions and any rights with respect to stock options that were cancelled when his employment ended." Through a series of amended complaints, Catalyst asserted various claims, although only Count I remains in issue [9]:

---

**9.** Catalyst alleged three other counts, which are not in issue:

### COUNT II

#### *FRAUD OR DECEIT*

45. HealthExtras repeats and incorporates by reference the allegations in paragraphs 1–39 as if fully set forth here.
46. Magill intentionally made false representations of material facts to HealthExtras both before and during his employment.
47. Magill knew those representations were false at the time he made them or he made them with such reckless indifference to the truth that it would be reasonable to charge Magill with knowledge of its falsity.
48. Magill made the false representations with the intent that HealthExtras would rely on those false representations and pay Magill monies or compensation to which he otherwise would not have been entitled.
49. HealthExtras justifiably relied on Magill's false representations and consequently paid Magill monies and compensation to which he was not entitled.
50. As a result of Magill's actions, HealthExtras has suffered damages in an amount likely to exceed $750,000.

### COUNT III

#### *NEGLIGENT MISREPRESENTATION*

51. HealthExtras repeats and incorporates by reference the allegations in paragraphs 1–45 as if fully set forth herein.
52. Magill, owing HealthExtras a duty of care, negligently misrepresented his education, work experience, business contacts and his work activities while employed by HealthExtras.

## COUNT I

### *DECLARATORY JUDGMENT: NO LEGAL CLAIM BY MAGILL*

41. HealthExtras repeats and incorporates by reference the allegations in paragraphs 1–35 as if fully set forth here.

42. This cause of action arises under the Maryland Declaratory Judgment Act, §§ 3–401 *et seq.* of the Courts & Judicial Proceedings Article of the Annotated Code of Maryland.

43. An actual controversy exists between HealthExtras and Magill as to whether Magill has any claim for alleged unpaid commissions and any rights with respect to stock options that were cancelled when his employment ended.

44. HealthExtras is entitled to a declaration that Magill has no legal claim to receive any further commission pay-

---

53. Magill's representations regarding his education, prior work experience, business contacts and work activities while employed by HealthExtras were done with the intention of obtaining property (namely money and valuable stock) for Magill from HealthExtras.

54. Magill knew HealthExtras would likely rely on those misrepresentations and thereby cause damage to HealthExtras.

55. HealthExtras justifiably relied on Magill's misrepresentations.

56. As a result of Magill's misrepresentations, HealthExtras has suffered damages in an amount likely to exceed $750,000.

#### COUNT IV

#### *BREACH OF FIDUCIARY DUTY*

57. HealthExtras repeats and incorporates by reference the allegations in paragraphs 1–56 as if fully set forth herein.

58. By virtue of his employment, Magill owed a fiduciary duty to HealthExtras to act in good faith with care, skill and diligence for the sole benefit of his employer and to make full disclosure of material facts regarding his employment.

59. Magill breached his fiduciary duty owed to HealthExtras by, among other things, (a) refusing and failing to disclose the fact that he had accepted a job with a competitor; (b) enticing and encouraging NMHC to pursue the defection of Don Houchin, and by actively participating in that effort; and (c) obtaining and then failing to disclose the fact that he was receiving legal advise [sic] from the counsel of a competitor on matters pertaining to his contractual obligations to HealthExtras.

ments, or to exercise any stock options, or to otherwise receive any other monies or benefits from HealthExtras.

Mr. Magill filed an Answer as well as a Counterclaim alleging three claims, only one of which formed the basis for the result that Catalyst contests [10]:

## COUNT II

*(Violation of Maryland Wage Payment and Collection Law)*

35. Magill restates and incorporates Paragraphs 1 through 34 herein.

---

**10.** Mr. Magill's other two counterclaims included:
### COUNT I
*(Breach of Contract)*

31. Magill restates and incorporates Paragraphs 1 through 30 herein.
32. Magill's employment agreement with HealthExtras entitled him to receive override commissions on all business generated by his sales team as part of his compensation.
33. Magill's agreement with HealthExtras also entitled him to receive the aforesaid stock options as part of his compensation.
34. HealthExtras' failure and refusal to pay the commissions to Magill and to allow him to exercise his stock options as aforesaid were material breaches of his contract with HealthExtras.
### COUNT III
*(Violation of the Family and Medical Leave Act)*
39. Magill restates and incorporates Paragraphs 1 through 38 herein.
40. The Family and Medical Leave Act ("FMLA"), 29 U.S.C. Sec. 2601 *et seq.*, requires a covered employer to grant an eligible employee up to 12 weeks of leave in a 12–month period when the employee is unable to work because of a serious health condition.
41. HealthExtras is a covered "employer" under the terms of the FMLA and its implementing regulations.
42. Magill is an "eligible" employee as that term is defined in the FMLA and its implementing regulations.
43. In March 2006 Magill, as a result of an automobile accident, suffered a "serious health condition" as that term is defined in the FMLA and its implementing regulations.
44. Magill was entitled to take leave under the FMLA as a result of his serious health condition.
45. HealthExtras' termination of Magill on April 5, 2006, while he was on leave was in violation of the FMLA.

36. Pursuant to the Maryland Wage Payment and Collection Law, Maryland Labor and Employment, Sec. 3–501 *et seq.*, HealthExtras was required to pay Magill all wages owed to him for work performed before termination at or before the date that Magill would have been paid had he not been terminated, or not later than two weeks thereafter.

37. Magill's commissions and stock options were compensation for work performed by him and, therefore, were "wages" under the Maryland Wage Payment and Collection Law.

38. HealthExtras' failure and refusal to pay the commissions to Magill and its refusal to allow him to exercise his stock options as aforesaid were violations of the Maryland Wage Payment and Collection Law, as was any failure to pay him for his accrued leave.

A flurry of cross motions for partial summary judgment occurred, but relying on *Medex v. McCabe*, 372 Md. 28, 811 A.2d 297 (2002), the Circuit Court judge entered a written order on June 18, 2008, reflecting his March of 2007 oral rulings, that granted Mr. Magill's Motion for Partial Summary Judgment as to Count II of his Counterclaim regarding his claim for 60,000 stock options and ordered, in the same document, that Mr. Magill was entitled to exercise the 60,000 remaining stock options, regardless of his termination of employment, and regardless of any contractual requirement that he remain employed for the options to vest, because the stock options "constitute[d] both 'wages' and 'wages due for work performed' under the Act," and were "deemed to have vested." Thereafter, the parties stipulated to the dismissal with prejudice of Counts II and III of Catalyst's Complaint and Counts I and III of Mr. Magill's Counterclaim. The Circuit Court judge had previously granted Mr. Magill's Motion for Partial Summary Judgment as to Catalyst's Count IV. As a result, the Circuit Court judge entered a final judgment on October 30, 2008, in favor of Mr. Magill, and against Catalyst, in the amount of $849,262.50, treating the options as if exercised and establishing the stock value as the measure of damages. The

court also responded, in the same final judgment order, to Catalyst's request for Declaratory Judgment:

> **ORDERED,** that in response to Plaintiff Catalyst's request for a Declaratory Judgment under Count I of its First Amended Complaint asking the Court to find that it owed no additional compensation to Defendant Magill as a result of the termination of the parties employment relationship on April 5, 2006, the Court finds and declares that Plaintiff Catalyst owed Defendant Magill additional compensation upon his termination, specifically, the value of the unvested stock options granted him during his employment in accordance with the reasons stated in the Court's May 20, 2008 Order,[11] and related oral rulings, granting partial summary judgment in favor of Defendant Magill; . . .

Catalyst, thereafter, appealed to the Court of Special Appeals.[12]

## STANDARD OF REVIEW

 The entry of summary judgment is governed by Rule 2–501, which provides in pertinent part:

> (f) **Entry of judgment.** The court shall enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law.

As we recently stated in *Gourdine v. Crews,* 405 Md. 722, 735–36, 955 A.2d 769, 777–78 (2008), the standard of review of a grant of such a motion is as follows:

---

11. The Circuit Court judge's reference to the "May 20, 2008 Order," is a reference to the June 18, 2008 Order, as May 20, 2008 is the date on which the judge signed the Order, and June 18, 2008, is the date on which the Order was entered.

12. The Circuit Court judge ordered, "that pursuant to the agreement of the parties, enforcement of the judgment in this action is stayed pending appeal without the Plaintiff Catalyst being required to post a supersedeas bond or other security."

In considering a trial court's grant of a motion for summary judgment, this Court reviews the record in the light most favorable to the non-moving party. *Anderson v. Council of Unit Owners of Gables on Tuckerman Condominium,* 404 Md. 560, 570–71, 948 A.2d 11, 18 (2008); *Rodriguez v. Clarke,* 400 Md. 39, 926 A.2d 736 (2007); *Rhoads v. Sommer,* 401 Md. 131, 148, 931 A.2d 508, 518 (2007) ("We review the record in the light most favorable to the non-moving party and construe any reasonable inferences that may be drawn from the facts against the moving party."); *Harford County v. Saks,* 399 Md. 73, 82, 923 A.2d 1, 6 (2007) (In reviewing a trial court's decision on a motion for summary judgment, "we seek to determine whether any material facts are in dispute and, if they are, we resolve them in favor of the non-moving party."); *Lovelace v. Anderson,* 366 Md. 690, 695, 785 A.2d 726, 728 (2001) (In reviewing a grant of the defendants' motions for summary judgment, "we must review the facts, and all inferences therefrom, in the light most favorable to the plaintiffs."). If no material facts are in dispute, this Court must determine whether the Circuit Court correctly entered summary judgment as a matter of law. *Anderson,* 404 Md. at 571, 948 A.2d at 18; *Rodriguez,* 400 Md. at 70, 926 A.2d at 754; *Saks,* 399 Md. at 82, 923 A.2d at 6; *Property and Casualty Ins. Guaranty Corp. v. Yanni,* 397 Md. 474, 480–81, 919 A.2d 1, 5 (2007); *Standard Fire Ins. Co. v. Berrett,* 395 Md. 439, 451, 910 A.2d 1072, 1079 (2006). On appeal from an order entering summary judgment, we review "only the grounds upon which the trial court relied in granting summary judgment." *Rodriguez,* 400 Md. at 70, 926 A.2d at 754, quoting *Standard Fire,* 395 Md. at 450, 910 A.2d at 1079; *Eid v. Duke,* 373 Md. 2, 10, 816 A.2d 844, 849 (2003), quoting *Lovelace,* 366 Md. at 695, 785 A.2d at 729.

 The standard of review for a declaratory judgment entered as a result of the grant of a motion for summary judgment is "whether that declaration was correct as a matter of law." *Olde Severna Park Improvement Ass'n, Inc. v. Gunby,* 402 Md. 317, 329, 936 A.2d 365, 371 (2007) (citations

omitted). We have held that "[w]hile it is permissible for trial courts to resolve matters of law by summary judgment in declaratory judgment actions," *Megonnell v. United Services,* 368 Md. 633, 642, 796 A.2d 758, 764 (2002), the court must, in a separate document and in writing, define the rights and obligations of the parties or the status of the thing in controversy. *Lovell Land Inc. v. State Highway Admin.,* 408 Md. 242, 256, 969 A.2d 284, 292 (2009), citing *Union United Methodist v. Burton,* 404 Md. 542, 550, 948 A.2d 1, 5 (2008), *Allstate v. State Farm,* 363 Md. 106, 117 n. 1, 767 A.2d 831, 837 n. 1 (2001). This requirement is applicable even if the action is not decided in favor of the party seeking the declaratory judgment. *Lovell,* 408 Md. at 256, 969 A.2d at 292, citing *Ashton v. Brown,* 339 Md. 70, 87, 660 A.2d 447, 455 (1995).

## DISCUSSION

█ Sections 3–501 to 3–509 of the Labor and Employment Article is otherwise known as the Maryland Wage Payment and Collection Law (Wage Act or Act), enacted originally in 1966 for the purpose of "imposing requirements as to the regularity, frequency and medium of wage payments and permissible deductions therefrom; providing for penalties, and conferring enforcement duties and powers on the Commissioner of the Department of Labor and Industry." 1966 Md. Laws, Chap. 686. Section 3–505 provides that "[e]ach employer shall pay an employee . . . all wages due for work that the employee performed before the termination of employment, on or before the day on which the employee would have been paid the wages if the employment had not been terminated."

Section 3–501(c) defines the term "wage" broadly:

(c) *Wage.*—(1) "Wage" means all compensation that is due to an employee for employment.

(2) "Wage" includes:

(i) a bonus;

(ii) a commission;

(iii) a fringe benefit; or

(iv) any other remuneration promised for service.

In *Whiting–Turner Contracting Co. v. Fitzpatrick,* 366 Md.
295, 304–05, 783 A.2d 667, 672 (2001), we explained that
Section 3–501(c)(iv) serves two functions:

> [Section 3–501(c)(iv)] makes clear both that the listed forms
> of remuneration are simply examples, by the use of the
> phrase "any other remuneration," and that the "other remu-
> neration" that may be included in—in order to be consid-
> ered—wages must have been "promised for service."

We also remarked that reading Sections 3–501(c)(1) and (c)(2)
together, "the wages which an employee is due, and which
must be paid on termination of employment, consist of all
compensation, and any other remuneration, that the employee
was promised in exchange for his work." *Id.* at 303, 783 A.2d
at 671–72.

█ Importantly, for our determination regarding the un-
vested stock options in the instant case, we turn to our bright-
line test, as devised in *Whiting–Turner,* which provides that
only when wages have been promised as part of the compensa-
tion for the employment arrangement and *all conditions
agreed to in advance* for earning those wages have been
satisfied, will Section 3–505 requiring payment of wages due
apply. *Id.* at 305, 783 A.2d at 672–73. Because the Wage Act
does not list "stock options" under the definition of "wage," we
must determine whether Mr. Magill's stock options were
merely exchanged as remuneration for his work, or whether
they were exchanged as remuneration for his work and sub-
ject to any additional unfulfilled promises or conditions, which
would place them outside of the definition of "wage." *Id.* at
303, 305, 783 A.2d at 671–73.

We have defined the term "wage" in *Whiting–Turner,* 366
Md. at 303, 783 A.2d at 671 and *Medex v. McCabe,* 372 Md. 28,
41, 811 A.2d 297, 305 (2002), and that definition is relied upon
by both of the parties before us. In *Whiting–Turner,* we
considered whether a profit-sharing bonus constituted a
"wage" under Section 3–501(c). When Joe Fitzpatrick was
hired as a full-time employee, his compensation agreement
consisted of a weekly salary and a potential profit-sharing

bonus; profit-sharing was conditioned upon Fitzpatrick achieving two years of employment and depended upon the profitability of the company. Before reaching two years with the company, Fitzpatrick learned that other employees in his group had received bonus checks. Instead of accepting the company's offer to stay and receive a bonus check, Fitzpatrick decided to quit and sue to collect the bonus pay.

In holding that the profit-sharing bonus was not a "wage" under the Wage Act, we reasoned that although the parties agreed, at the time Fitzpatrick was hired, that profit-sharing would be part of his compensation, Fitzpatrick had failed to meet the agreed upon service condition of two years of employment, and therefore, his bonus had not been earned before termination:

> Had [Fitzpatrick] been with [Whiting–Turner] for two years when the decision was made to offer him a bonus and had the financial condition of [Whiting–Turner] justified it, there would be no doubt of [Fitzpatrick's] entitlement, that he would have earned the distribution in this case. That is so because sharing in the profits of the company after two years was promised as part of [his] compensation package. Here, however, [Whiting–Turner] decided to give [Fitzpatrick] a bonus before he had been employed for two years. Where such remuneration is not a part of the compensation package promised, it is merely a gift, a gratuity, revocable at any time before delivery.

*Whiting–Turner*, 366 Md. at 305–06, 783 A.2d at 673.

In *Medex*, we relied on *Whiting–Turner* and examined whether "incentive fees" qualified as wages under Section 3–501(c). Timothy J. McCabe was employed as a sales representative for Medex, a medical supplies manufacturer, and received a $49,000 salary plus incentive fees that were paid out under a series of incentive compensation plans. The Medex employee manual stated three conditions for receiving incentive compensation, (1) meeting specified targets, (2) being an employee at the end of the incentive plan (generally the fiscal year), and (3) being employed at the time of actual payment.

McCabe satisfied the first two conditions by meeting his sales targets and resigning four days after the end of the fiscal year, but left Medex before payments were made under the plan. When Medex refused to pay, citing McCabe's failure to meet the third condition, McCabe sued.

We held that earned incentive fees were earned commissions under the Wage Act and emphasized that "it is the exchange of remuneration for the employee's work that is crucial to the determination that compensation constitutes a wage." *Medex*, 372 Md. at 36, 811 A.2d at 302. In distinguishing *Whiting–Turner*, we opined:

In this case, the incentive fees were related directly to sales made by the employees during a defined fiscal year. McCabe had performed all the work necessary to earn the fees, and Medex had registered the sales. In the terminology of the incentive plan itself, some of the incentive fees "begin to earn" at meeting 80% of a target goal, while another "[i]ncentive begins" upon the sale of certain goods. The work of the employee may have preceded the payment date of the fees, but the fees were compensation for work performed, and, thus, wages under the Act.

*Id.* at 37, 811 A.2d at 302–03. We concluded that the company was free "to implement its own hierarchy of entitlement," but that McCabe's right to compensation vested when he did everything required to earn the wages, rather than when Medex determined to pay the commissions; to hold otherwise would place McCabe's wages at the whim of his employer to determine when to pay him. *Id.* at 42, 811 A.2d at 305.

In the present case, Catalyst argues that the Circuit Court judge erred in determining that Mr. Magill's conditionally granted unvested stock options were wages under the Wage Act and could be exercised after termination, despite Mr. Magill's failure to reach specific vesting dates set forth in the Grant Agreements. Catalyst contends that the Circuit Court judge's decision contravened "well-established law and business practice in Maryland and throughout the United States," and confused the Wage Act's language regarding "remunera-

tion promised for service" as tantamount to an irrevocable grant of stock, rather than a grant of the option to purchase stock conditioned upon continued employment, which was not met. Catalyst maintains that the grant of stock options, rather than wages, were a promise of conditional incentive equity compensation in exchange for continued service.

Mr. Magill counters that the Circuit Court judge was correct in holding that his stock options were wages "promised and earned as compensation" under the Wage Act. Mr. Magill contends that because the first two stock option grants were part of his compensation package, and the third grant of options was awarded for meeting a specific performance sales goal, all of the options were wages earned during his employment and payable upon termination. He argues that continuing employment until the exercise dates was not required, because the stock options vested when the parties agreed to a revised compensation package in November of 2005.

In a March of 2007 hearing on Catalyst's motion for reconsideration of the denial of its motion for partial summary judgment, the Circuit Court judge in the instant case stated his belief that Mr. Magill's stock options were wages, pursuant to our reasoning in *Medex:*

> In my opinion on the motion for reconsideration by HealthExtras, this case is more like *Medex* rather than *Whiting–Turner.* On the *Medex*, once the options were earned as wages, Magill's interest in them vested and he was entitled to payment of the options. The Court of Appeals found that the incentive payment were wages so that the former employee could collect them. Payment of the incentive fees was conditioned upon meeting targets and being an employee at the end of the incentive plan as well as at the time of payment.
>
> In this case, HealthExtras refers to the stock options programs as an incentive program. Magill met the goal of reaching 200,000 PBM lives by the target date, and he was rewarded with the options. In my opinion, this makes them wages, remuneration in exchange for work. The other

75,000 options were part of Magill's compensation package, which, under the law, also makes them wages.

The *Medex* stated, and we've all talked about this, it is the exchange of remuneration for the employee's work that is crucial to the determination that the compensation constitutes a wage. An employee's right to compensation vests when the employee does everything required to earn the wages. Magill did everything required to earn the wages.

\* \* \*

Despite the arguments to the contrary and the language to the contrary, the stock option award agreements, in the Court's opinion, are void under the rationale of *Medex.*[13]

In concluding that the stock options were wages, the Circuit Court judge determined that they were granted for goals already achieved, premising his decision on Section 3–501(c)(2)(iv) which defines wages as "any other remuneration promised for service." In so concluding, the judge erred as a matter of law because the options were granted for services, but their exercise was conditioned upon Mr. Magill's employment for a specific time period, which he did not meet.

The letter agreements between Catalyst and Mr. Magill did not promise an unconditional grant of stock to Mr. Magill; rather, the agreements explicitly conditioned the right to exercise the grant of stock options on continued employment until a date that was expressly defined. In this regard, Mr. Magill is in a similar posture to the employee in *Whiting–Turner;* had Mr. Magill continued employment with Catalyst on the next vesting date, he would have been entitled to exercise his vested stock options. Unlike the employee in *Medex,* Mr. Magill did not meet all of the agreed upon

---

**13.** In a June of 2007 hearing on the partial summary judgment motions, counsel for Catalyst queried the judge as to whether he viewed the Grant Agreements as unconditional entitlements to shares of stock, irrespective of the vesting provisions in the agreements:

[CATALYST'S COUNSEL]: Is it the Court's current view that once he walked in the door, he became entitled to those 40,000 shares of stock, notwithstanding the vesting provisions in the agreement.

THE COURT: You bet, little beaver.

conditions to exercise his stock options. *Medex*, 372 Md. at 37, 811 A.2d at 302–03.

Mr. Magill also cites *Tuttle v. Geo. McQuesten Company, Inc.*, 227 A.D.2d 754, 642 N.Y.S.2d 356 (1996) and *Scully v. US WATS, Inc.*, 238 F.3d 497 (3rd Cir.2001), for the proposition that "incentive compensation" and "stock options," respectively, are wages. In *Tuttle*, cited by us in *Medex*, our sister state court held that "incentive compensation" was considered a "wage" under New York's labor law, and the former employee in that case had a vested right to the money when he was terminated. *Tuttle* is distinguishable, however, because the "incentive compensation" at issue in that case was a commission earned by the employee prior to his termination, unlike the incentive stock options in this case, which were not vested at the time Mr. Magill left employment.

In *Scully*, the Third Circuit Court of Appeals interpreted whether the employee's stock options, which were promised compensation under a two-year employment contract, fell within the Pennsylvania Wage Payment and Collection Law's (WPCL) definition of "wage." The WPCL defines "wage" as including "fringe benefits or wage supplements," which, in turn, is defined as including "any other amount to be paid pursuant to an agreement to the employee." *Scully*, 238 F.3d at 517. The Court reasoned that the stock options fell within the definition of wage, because the employer agreed to deliver the stock options as part of a two-year oral employment contract. As such, the Court held that because there was an unlawful breach of the employment contract, and the employee had rendered all services necessary for the options to vest, the Company could not be allowed to breach the two-year employment contract in an effort to disallow the employee from exercising his options. The Court also held that the employee could exercise his unvested options, because he would have exercised those options after they vested had he not been wrongfully terminated. The facts at issue in *Scully* are distinctly different from the facts in the present case. Unlike in *Scully*, Mr. Magill was an at will employee who left his employment before meeting all service conditions of his com-

pensation agreement and before the stock options at issue had vested.

Mr. Magill also cites to other federal cases interpreting the Wage Act, including *Varghese v. Honeywell Int'l, Inc.*, 424 F.3d 411 (4th Cir.2005), *Mazer v. Safeway, Inc.*, 398 F.Supp.2d 412 (D.Md.2005), and *Rogers v. Savings First Mortgage, LLC*, 362 F.Supp.2d 624 (D.Md.2005). In *Varghese*, Thomas Varghese filed a lawsuit claiming that his former employer, Honeywell, violated the Maryland Wage Act when the Company terminated his right to exercise previously granted, and vested, stock options. The Fourth Circuit Court of Appeals held that the stock options at issue, despite having fully vested by the time Varghese was terminated from employment, were not "wages" under the Wage Act, because there was no evidence that the stock option grants had been *promised* to him as remuneration for his efforts in his employment agreement. The Court distinguished its facts from the conditional grants of stock options in both *Whiting–Turner* and *Medex*, noting that Varghese never could claim that he was entitled to "wages," because Honeywell always retained discretion in awarding him stock options and "no document or testimony set[ ] forth any conditions [or measurable benchmarks] that, once satisfied, would convert mere eligibility to entitlement." *Id.* at 419–20 & n. 15.

In *Mazer*, Timothy Mazer sued his former employer, Safeway, alleging, among other things, that Safeway failed to pay him compensation and benefits in violation of Maryland law. Judge Alexander Williams, Jr., relied on *Varghese*, and held that although Mazer received stock options, which could have been considered "wages," he did not provide any evidence that he had received the stock options in exchange for his continued employment, and "[t]he grant of the options itself, however, does not show that the options were promised." *Mazer*, 398 F.Supp.2d at 426–27.

Mr. Magill suggests that *Varghese* and *Mazer* support his argument that the definition of "wages" can include stock options if they are promised as compensation, but disregards

their holdings because the stock options at issue were found to be discretionary awards rather than promised compensation. The present case is distinguishable, however, because even though the stock options were promised compensation, Mr. Magill failed to achieve the agreed upon service condition of being employed on a certain date, a fact that was conspicuously absent as an issue in *Varghese* and *Mazer*.

In *Rogers*, Judge William M. Nickerson of the U.S. District Court for Maryland relied upon *Whiting–Turner* and *Medex*, in holding that unpaid year-end *bonuses* were due to former employees of Savings First Mortgage, LLC, under the Wage Act. Mr. Magill ignores the fact that "a bonus" is explicitly included in the definition of "wage" in the Wage Act. Section 3–501(c)(2)(i). Because we hold that Mr. Magill's unvested stock options were not "wages," pursuant to the Wage Act, *Rogers* is inapposite.[14]

**CONCLUSION**

 The Circuit Court judge, in the instant case, granted partial summary judgment in favor of Mr. Magill, but did not enter a separate, written declaratory judgment defining the

---

14. Our conclusion is consistent with other courts which have gone further than we do herein and have held that under their respective wage statutes, stock options are not "wages." *See, e.g., Weems v. Citigroup, Inc.*, 453 Mass. 147, 900 N.E.2d 89, 93–95 (2009) (holding that stock options awarded under a voluntary payroll program, which included a forfeiture provision upon termination, did not constitute "wages" subject to the Massachusetts Weekly Wage Act); *Paolini v. Albertson's, Inc.*, 143 Idaho 547, 149 P.3d 822, 824–25 (2006) (holding that stock options do not constitute wages under Idaho's wage laws); *See also IBM v. Bajorek*, 191 F.3d 1033, 1039 (9th Cir.1999) (interpreting California law and holding that stock options are not wages under the California Labor Code; rather, stock options are "contractual rights to buy shares of stock"); *Weir v. Anaconda Co.*, 773 F.2d 1073, 1086 (10th Cir.1985) (interpreting Kansas law and holding that stock options are not wages under the Kansas Wage Payment Act).

Mr. Magill cites various decisions of the Court of Special Appeals, those being *Aronson v. Fetridge*, 181 Md.App. 650, 957 A.2d 125 (2008), *Himes v. Anderson*, 178 Md.App. 504, 943 A.2d 30 (2008), and *Stevenson v. Branch Banking & Trust Corp.*, 159 Md.App. 620, 861 A.2d 735 (2004). We need not address these cases, because vesting of stock options was not an issue.

rights and obligations of the parties. This Court, in its discretion, "may 'review the merits of the controversy and remand for entry of an appropriate declaratory judgment by the circuit court.'" *Lovell Land, Inc. v. State Highway Admin.*, 408 Md. 242, 256, 969 A.2d 284, 292 (2009), quoting *Bushey v. Northern Assurance*, 362 Md. 626, 651, 766 A.2d 598, 611 (2001). *See Rogers v. P–M Hunter's Ridge, LLC*, 407 Md. 712, 745, 967 A.2d 807, 827 (2009); *Union United Methodist Church, Inc. v. Burton*, 404 Md. 542, 559, 948 A.2d 1, 11 (2008); *Messing v. Bank of America*, 373 Md. 672, 702–03, 821 A.2d 22, 39–40 (2003); *Mitchell v. Maryland Cas. Co.*, 324 Md. 44, 63, 595 A.2d 469, 478 (1991).

Mr. Magill was promised the right to exercise the stock option grants upon meeting the service condition of being employed on the vesting dates; he did not meet the conditions for his stock options to vest, thus, we hold that the Circuit Court judge erred in holding that the conditionally granted unvested stock options were wages under the Wage Act. As a result, this case is remanded to the Circuit Court for entry of a declaratory judgment to that effect, consistent with this opinion and for a grant of Catalyst's motion for partial summary judgment.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY REVERSED; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO GRANT SUMMARY JUDGMENT FOR APPELLANT AND TO ENTER A DECLARATORY JUDGMENT CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT TO BE PAID BY APPELLEE.**

MURPHY, J., concurs and dissents, and files opinion.

MURPHY, Judge, concurring in part and dissenting in part.

I agree that Appellee was not entitled to summary judgment in his favor. I am also persuaded, however, that neither party is entitled to summary judgment. I would, therefore, vacate the judgment of the Circuit Court and remand for a trial on the merits of Appellee's complaint.